# United States Court of Appeals
## For the First Circuit

No. 05-1505

NATIONAL CASUALTY COMPANY,

Petitioner, Appellant,

v.

FIRST STATE INSURANCE GROUP,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]

Before

Lynch, Circuit Judge,
Stahl, Senior Circuit Judge,
and Lipez, Circuit Judge.

Natasha C. Lisman, with whom Susan A. Hartnett was on brief, for appellant.
Lloyd A. Gura, with whom Lawrence S. Greengrass, Sanjit Shah, Mound Cotton Wollan & Greengrass, and Prince, Lobel, Glovsky & Tye LLP were on brief, for appellee.

December 2, 2005

**STAHL, <u>Senior Circuit Judge</u>.** When a dispute arose between the National Casualty Company and the First State Insurance Group over the amount of a reimbursement the former owed the latter under a reinsurance contract, the parties undertook to arbitrate it. During the arbitration proceedings, National Casualty sought certain documents in discovery, but First State refused to produce them despite an order from the arbitration panel to do so. Ultimately, the arbitrators reached a decision in First State's favor despite First State's failure to produce the desired documents. Frustrated, National Casualty brought suit in federal District Court seeking to overturn the decision of the arbitration panel. The district judge denied all relief, and this appeal followed. We affirm.

### I. BACKGROUND

Appellant National Casualty and appellee First State were parties to a set of contracts under which National Casualty served as a reinsurer to First State on a number of First State's insurance obligations. The arbitration agreement and proceedings at issue in this case relate only to the reinsurance contracts, but the argument between the parties over their obligations under the reinsurance contracts will be more intelligible if we relate some background information relevant to the First State policies for which National Casualty was the reinsurer. We use the term "underlying policies" to designate the policies First State issued

to its insureds. The "reinsurance contracts" or simply "the contracts" will refer to the reinsurance contracts at issue in the case. There is no dispute over the facts, so we relate them as represented by the parties, with certain supplemental information gleaned from the record.

First State was required under the underlying policies to cover some portion of its insureds' liability for so-called asbestos non-product liability claims.[1] The equipment-installation and facilities-maintenance firms typically exposed to these claims generally carry what is called "operations" insurance. Where insurance for product liability claims is often hard-capped at a fixed sum, operations insurance, by contrast, usually repays a certain maximum amount for each incident giving rise to liability. The per-incident coverage means that, if an insured had a given amount, for example, $1 million, of liability, and First State offered per-incident coverage of $100,000, First State's obligation to the insured could be determined only in light of the source of the liability. If the $1 million in liability arose from one

---

[1]"Asbestos non-product liability claims" are a relatively recent category of asbestos-related claims. The earlier class of claims known as "asbestos product liability claims," claims pressed against asbestos manufacturers, are now rare: the pool of funds available to cover this type of claim was largely depleted by the 1990s as the asbestos manufacturers went bankrupt. In the late 1990s, claims were increasingly brought against firms which had been responsible for installing or servicing products containing asbestos. These new claims are referred to in the industry as "non-product liability claims."

incident, First State would owe its per-incident amount only once, and pay $100,000, while if $1 million was the insured's total liability on three claims, First State would pay $300,000. Under the policies at issue, therefore, First State would pay a smaller share of a given amount of a policyholder's liability to third parties if that liability was based on a single incident, and a greater share if the underlying liability was based on multiple incidents.

National Casualty was First State's reinsurer for these policies. It was obligated to reimburse First State for some portion of the latter's payments to its insureds. Briefly put, the structure of the reinsurance contracts was such that, if First State settled its underlying claims on a single-occurrence basis, National Casualty would reimburse it for a greater amount, and if it settled those claims on a multiple-occurrence basis, National Casualty would pay less.

First State settled a number of contested claims under the underlying policies, and looked to National Casualty for reimbursement. It asserted to National Casualty that the underlying claims had been settled on a single-occurrence basis and that it was therefore entitled to a high level of reimbursement. National Casualty, suspecting that First State had misrepresented the bases on which the underlying claims had been settled in an effort to maximize its reimbursement, compelled arbitration, as it

was entitled to do under the contracts' binding and mandatory arbitration clauses.[2] The parties selected an arbitration panel under the terms of their agreement, which permitted each side to choose one member of the panel, with a third panel member selected by the two unilaterally appointed members.

During the arbitration, National Casualty requested that First State provide it with certain documents that detailed First State's internal legal assessments of the claims for which it was requesting reinsurance payments. National Casualty claimed that these documents, and these documents only, would reveal the basis on which First State had settled the underlying claims, and that production of the documents was therefore necessary in order to determine National Casualty's obligations to First State. The panel ordered First State to produce the documents, warning that, if it did not, the panel would draw whatever negative inferences it deemed appropriate. First State, claiming that the documents were privileged attorney-client communications or attorney work-product,

---

[2]The broad arbitration clauses in each of the reinsurance contracts read: "If any dispute shall arise between the Reinsured and the Reinsurer, either before or after the termination of this Contract, with reference to the interpretation of this Contract or the rights of either party with respect to any transaction under this Contract, the dispute shall be referred to three arbitrators, one to be chosen by each party and the third by the two so chosen. . . . The arbitrators shall consider this Contract an honorable engagement rather than merely a legal obligation; they are relieved of all judicial formalities and may abstain from following the strict rules of law. The decision of a majority of the arbitrators shall be final and binding on both the Reinsured and the Reinsurer."

declined to produce the documents out of fear, it said, of waiving any privilege in future dealings with its insureds.

National Casualty immediately protested First State's failure to produce the documents. It requested that the arbitration panel delay its hearings in order to give the parties time to brief the prejudicial effect of the withholding of the documents, but the panel denied the request. National Casualty then filed a claim in the District Court for the District of Massachusetts, asking the court to enjoin further arbitral proceedings. While the claim before the District Court was pending, the panel ruled in favor of First State, and National Casualty paid First State the balance owed as determined by the panel. The issuance of a final order by the arbitration panel rendered National Casualty's initial claims for an injunction against continuation of the arbitration moot, but National Casualty then amended its complaint. In the amended complaint, National Casualty argued that the court should overturn the arbitration award in First State's favor because First State's failure to comply with the arbitration panel's production order constituted a breach of contract, voiding the arbitration clause and terminating the arbitration panel's jurisdiction. It also moved to have the district court vacate the arbitration panel's award for procedural deficiencies under sections 10(a)(1) and (3) of the Federal Arbitration Act (FAA), 9 U.S.C. §§ 10(a)(1) & (3). First State

requested dismissal of the complaint, challenged the motion for vacatur, and moved for sanctions. The district court denied the motion to vacate and dismissed National Casualty's complaint, but declined First State's request that it impose sanctions on National Casualty. National Casualty timely appealed.

## II. DISCUSSION

On this appeal, National Casualty urges that the district court was wrong to deny its motion to vacate under its various FAA theories and to dismiss its breach of contract claim. We discuss each issue in turn.

## A. FAA

The district court treated National Casualty's complaint requesting vacatur of the arbitration panel's final award as a motion to vacate the award under 9 U.S.C. § 10.[3] We review the disposition of a motion to vacate under FAA § 10 de novo. Bull HN Info. Sys., Inc. v. Hutson, 229 F.3d 321, 330 (1st Cir. 2000). We are, however, bound, as the district court was, by the rule that court review of arbitral awards is "extremely narrow and exceedingly deferential," id. (quoting Wheelabrator Envirotech

---

[3]National Casualty made its original request for vacatur under the FAA in its complaint. The general rule under the FAA, however, is that challenges brought under its provisions follow the rules of motion practice. See O.R. Securities, Inc. v. Professional Planning Associates, Inc., 857 F.2d 742, 745-46 (11th Cir. 1988); 9 U.S.C. § 6. The district court therefore treated the portions of the complaint brought under the FAA as if they had been raised by motion. This appears to have been proper and in any event, because the issue is not raised by the parties, we will assume that it was.

Operating Servs. Inc. v. Mass. Laborers Dist. Council Local 1144, 88 F.3d 40, 43 (1st Cir. 1996)), with the result that "[a]rbitral awards are nearly impervious to judicial oversight," id. (quoting Teamsters Local Union No. 42 v. Supervalu, Inc., 212 F.3d 59, 61 (1st Cir. 2000)).

National Casualty limited its FAA claims on the motion to vacate to claims of procedural irregularity. Specifically, it claims that the award was procured by undue means in violation of section 10(a)(1), and that the arbitrators were guilty of misconduct under section 10(a)(3).[4] Our review of the procedures that an arbitrator has implemented is, under the statute, extremely narrow. We turn now to identifying the scope of our review under each section and to evaluating the claims themselves.

---

[4] 9 U.S.C. § 10(a)(1) permits a court to vacate "where the award was procured by corruption, fraud, or undue means." 9 U.S.C. § 10(a)(3) permits vacatur "where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced." National Casualty complains that the district court applied the wrong legal standard in evaluating its claims under these provisions. The district court quoted our opinion in Wonderland Greyhound Park, Inc. v. Autotote Sys., Inc., 274 F.3d 34, 35 (1st Cir. 2001), and said that "[a]n arbitration award must be enforced if it is in any way plausible." (alteration in original). National Casualty suggests that the district court did not properly evaluate its claims under section 10, because it satisfied itself that the award was generally plausible, and so did not scrutinize the procedures the arbitrators employed for compliance with the FAA. Nothing in Wonderland suggests that it meant to make our review of arbitral decisions narrower than it had been before, or to preclude review under the FAA or under any other source of authority. The district court evidently understood this, and committed no error.

1. Arbitrator Misconduct

Section 10(a)(3) of the FAA lists three separate grounds for vacatur: it is appropriate "[w]here the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced." 9 U.S.C. § 10(a)(3). National Casualty urges an argument based on the second ground: it complains that the panel refused to hear pertinent and material evidence, and that the refusal amounted to "misconduct."

In this case, the arbitrators, who had been selected by the parties under the terms of a contract into which each freely entered, attempted at the behest of National Casualty to compel First State to produce the documents in question, but those documents were not ultimately produced. What is more, the arbitrators determined that they could reach a fair result if they drew an inference adverse to First State as to the contents of the withheld documents on the basis of First State's failure to produce them. National Casualty's claim is that this determination, that the case could be fairly resolved with a negative inference rather than with the evidence sought, constituted misconduct.

We may vacate under 10(a)(3) when an arbitrator has been "guilty of misconduct in refusing to hear evidence pertinent and material to the controversy." 9 U.S.C. § 10(a)(3). Not all

refusals to hear evidence are misconduct, of course. We have held instead that, under section 10(a)(3), "[v]acatur is appropriate only when the exclusion of relevant evidence 'so affects the rights of a party that it may be said that he was deprived of a fair hearing.'" Hoteles Condado Beach, La Concha and Convention Center v. Union De Tronquistas Local 901, 763 F.2d 34, 40 (1st Cir. 1985) (quoting Newark Stereotypers' Union No. 18 v. Newark Morning Ledger Co., 397 F.2d 594, 599 (3rd Cir. 1968)). Our evaluation of whether a deprivation of a right to present evidence rendered a hearing unfair does not take place in a vacuum, but will be informed by the parties' understanding of what constituted a fair hearing when they entered into their contract. Here, the relevant contract provisions not only relieved the arbitrators of any obligation to follow "the strict rules of law," but also released the arbitrators from "all judicial formalities." In the face of a clause that broad, which makes no mention of the production obligations of the parties or of the discovery procedures to be followed, and which so fully signs over to the arbitrators the power to run the dispute resolution process unrestrained by the strict bounds of law or of judicial process, a party will have great difficulty indeed making the showing, requisite to vacatur, that their rights were prejudiced.

Of course, the archetypical case in which we will consider a 10(a)(3) challenge is the one most clearly contemplated

by the statute, in which an arbitrator declines to take evidence proffered by a party. National Casualty directs us to no case in which an arbitrator's failure in its attempt to compel discovery constituted misconduct, and one might quibble that the term "refuse" could never apply to a case such as this, where the arbitrators did not refuse but rather sought to hear the evidence at issue. That literal interpretation, however, has not been the one adopted by the circuits that have had occasion to apply the law, which have taken section 10(a)(3) to authorize review for evidentiary failures broader than a simple refusal to consider evidence. See, e.g., Robbins v. Day, 954 F.2d 679 (11th Cir. 1992) (court willing to consider claim that failure to compel testimony constituted refusal to hear evidence under section 10(a)(3)), overruled on other grounds by First Options of Chicago v. Kaplan, 514 U.S. 938 (1995); Gulf Coast Indus. Workers Union v. Exxon Co., USA, 70 F.3d 847 (5th Cir. 1995) (arbitrator refused to hear evidence where it misled party into thinking it need not present certain evidence).

We assume arguendo that, as in our sister circuits, the law in this circuit permits a party to seek vacatur under 10(a)(3) where the arbitrator has not refused to hear evidence, but has instead merely failed in its efforts to bring certain evidence into the proceedings. Even so, we find no violation of the statute here, because any failure to hear evidence did not "'so affect[]

-11-

the rights of a party that it may be said that he was deprived of a fair hearing.'"  The arbitrators ruled that as a result of First State's refusal to produce the requested documents, they would draw inferences against First State as to what those documents would show.  This is a routine remedy, well within the arbitrator's powers.  The drawing of an inference against First State in this case offset any unfairness to National Casualty that resulted from holding a hearing without giving National Casualty access to the actual documents it sought.

We make this evaluation in light of the contract between the parties, which, as we have noted, contemplated broad power in the arbitrator to conduct the arbitral proceedings.  We note also that we have no reason here to suspect coercion or fraud in the inducement on the part of the parties, who appear to be sophisticated and capable of negotiating their business contracts in advance to protect themselves from the potential folly of any arbitrator they elect to subject their disputes to.  In these circumstances, we have no difficulty holding that the procedural device the arbitration panel implemented, offering a party the choice between production and a negative inference, was well within the discretion committed to it by the parties under the FAA.

National Casualty's secondary argument is its assertion that the arbitrators could not have reached the results they reached if they had drawn the promised negative inference.  There

are several problems with this analysis, apart from the fact that its premise is false. First, this is simply an attack on the merits of the award, which National Casualty has eschewed. Second, courts do not generally review what weight arbitrators give to a single piece of evidence. Finally, arbitrators need not give specific reasons for the decisions they reach. For all of these reasons, this argument has no merit.

2. Undue Means

National Casualty also argues that the arbitration panel's decision should be vacated as the product of "undue means." Section 10(a)(1) permits vacatur "[w]here the award was procured by corruption, fraud, or undue means." 9 U.S.C. § 10(a)(1). While this circuit has never confronted a claim for vacatur for "undue means," our sister circuits sensibly read the clause in a way that bars National Casualty's claim. The phrase "undue means" in the statute follows the terms "corruption" and "fraud." It is a familiar principle of statutory construction that a word should be known by the company it keeps. See Jarecki v. G. D. Searle & Co., 367 U.S. 303, 307 (1961). The best reading of the term "undue means" under the maxim noscitur a sociis is that it describes underhanded or conniving ways of procuring an award that are similar to corruption or fraud, but do not precisely constitute either. See PaineWebber Group, Inc. v. Zinsmeyer Trusts P'ship, 187 F.3d 988, 991 (8th Cir. 1999) ("The term 'undue means' must be

-13-

read in conjunction with the words 'fraud' and 'corruption' that precede it in the statute."); Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv., 52 F.3d 359, 362 (D.C.Cir. 1995) ("undue means" refers to conduct "equivalent in gravity to corruption or fraud, such as a physical threat to an arbitrator").

Nothing appellant has argued suggests that First State acted in a manner amounting to the kind of intentional malfeasance that justifies vacatur under the statute. Here, one party was offered a choice between producing documents or having to contend with an inference about their content. This, as we have just discussed, was a choice that was within the arbitrator's power to offer. To hold that the arbitrator may offer choice A or choice B to a party, but that the party's selection of choice B would invalidate the arbitrator's award, would defy common sense, and we will not do it. We therefore affirm the district court's holding that First State did not procure the arbitrator's award by undue means.

## B. Breach of Contract

The district court dismissed National Casualty's claims for breach of contract under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. We review 12(b)(6) dismissal de novo. Centro Medico del Turabo, Inc. v. Feliciano de Melicio, 406 F.3d 1, 5 (1st Cir. 2005).

National Casualty contends that First State's failure to comply with the arbitration panel's production order constituted breach of contract and thus terminated the panel's jurisdiction. The question of breach, however, is not ours to decide. The terms of the contract before us, read in light of the language of the FAA and Congress' evident intent in passing it, preclude our review of National Casualty's claim. Indeed, to consider ourselves empowered to undertake that review would be to jeopardize the national policy in favor of arbitration.

National Casualty's argument is based in part on First Options, 514 U.S. 938, in which the Supreme Court held that threshold questions of arbitrability are for the courts. Arbitrability questions are questions about who is the proper decision-maker in certain classes of cases. The default rule, in the absence of express contractual terms to the contrary, is that it is for the court to decide the validity and scope of an arbitration clause, and for the arbitrator to decide all matters within the scope of a valid clause. Id. When a substantive question falls within the scope of an arbitration clause, procedural questions ancillary to the substantive one are by default for the arbitrator to decide. See Marie v. Allied Home Mortgage Corp., 402 F.3d 1, 9-11 (1st Cir. 2005); Richard C. Young & Co., Ltd. v. Leventhal, 389 F.3d 1, 3-5 (1st Cir. 2004); PaineWebber Inc. v. Elahi, 87 F.3d 589, 599 (1st Cir. 1996) ("if

-15-

the parties have (1) entered into a valid arbitration agreement, . . . and (2) the arbitration agreement covers the subject matter of the underlying dispute between them, . . . then we will presume that the parties have made a commitment to have an arbitrator decide all the remaining issues necessary to reach a decision on the merits of the dispute.").

This is not a case of two parties contesting whether a certain matter is within the ambit of an arbitration agreement. This is not a case where an arbitrator has stated that failure to comply with a certain order would terminate the arbitrator's jurisdiction. This is not even a case where a party has blatantly defied an arbitrator's order. Rather, National Casualty insists that it may seek a <u>court</u> hearing on the effect of another arbitrating party's selection among procedural options offered by an arbitrator, during a discovery dispute, in the course of an arbitration both parties agreed to enter. This seems to us the very essence of a procedural matter. National Casualty has not provided, and we have not found, any authority that would license the district court to resolve the dispute involved. The question whether failure to comply with the arbitral order at issue here constituted breach and entitled National Casualty to any sort of remedy was for the arbitrator, and the district court rightly dismissed National Casualty's complaint.

## III. CONCLUSION

For the reasons stated above, we **<u>affirm</u>** the decision of the district court.