# United States Court of Appeals
## For the First Circuit

No. 05-2371

CYTYC CORPORATION,

Plaintiff, Appellant,

v.

DEKA PRODUCTS LIMITED PARTNERSHIP,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Selya, Lynch and Lipez, Circuit Judges.

Matthew M. Wolf, with whom Marc A. Cohn, Howrey LLP, Lisa J. Pirozzolo, Steven P. Lehotsky, and Wilmer Cutler Pickering Hale and Dorr LLP were on brief, for appellant.
Lee Carl Bromberg, with whom Eric Paul Belt and Bromberg & Sunstein LLP were on brief, for appellee.

March 1, 2006

**SELYA**, **Circuit Judge**.  Judicial review of arbitration awards is extremely narrow.  As a result, "disputes that are committed by contract to the arbitral process almost always are won or lost before the arbitrator."  Teamsters Local Union No. 42 v. Supervalu, Inc., 212 F.3d 59, 61 (1st Cir. 2000).  This case is no exception to that general rule.  Because the losing party, appellant Cytyc Corporation (Cytyc), has failed to establish any legally cognizable basis for setting aside the arbitrators' award, we uphold the district court's order granting the confirmation motion filed by the prevailing party, appellee DEKA Products Limited Partnership (DEKA).

## I.  BACKGROUND

Cytyc manufactures and sells a cervical cancer screening system.  DEKA operates a commercial research and development laboratory.  In the late 1980s, Cytyc endeavored to improve the accuracy of the traditional Pap smear test — a test that relies on technicians to prepare a microscope slide from each cervical cell sample and then review the specimen for irregularities.  Due to human error, this methodology yields a relatively high incidence of false negatives.  Cytyc proposed to solve that problem by using a computer imager to prescreen the slide specimens.

During the developmental phase of this project, Cytyc encountered a potentially insuperable obstacle: its imaging technology could accurately screen a thin, uniform layer of cells,

but the slide specimens prepared by human technicians were often disuniform. Desirous of obtaining standardized slide specimens, Cytyc retained DEKA to create an automated process for transferring cells from a test sample onto a slide.

DEKA successfully developed such a process (the ThinPrep system). This system consists of two components. The first is the ThinPrep processor — a machine that transfers the cells onto the slide. The processor utilizes technology patented by DEKA prior to its association with Cytyc. This body of knowledge is known as fluid management system (FMS) technology. The second component of the ThinPrep system is a set of four disposable accessories: a microscope slide, a sample collection device manufactured by a third party, a vial of Cytyc's patented preservative solution, and a filter cylinder invented specifically for use in the ThinPrep system. While the ThinPrep system employs a number of products and processes, its sine qua non is the FMS technology.

In March of 1993, Cytyc and DEKA entered into a licensing agreement (the Agreement) relative to the ThinPrep system. The Agreement recited that DEKA, by means of the FMS technology, had developed a "method and apparatus . . . to facilitate the preparation of slides for medical and laboratory purposes" and wished to license the FMS technology to Cytyc for use in the ThinPrep system. In exchange for this license, Cytyc agreed to pay

DEKA a royalty "equal to One Percent . . . of the Net Sales of Products or Improvements" covered by the Agreement.

By its terms, the Agreement divided royalty-bearing "Products" into two categories: "Product Hardware" and "Product Disposables." "Product Hardware" meant, in effect, the ThinPrep processor (we do not dwell on this, as there is no dispute between the parties concerning royalty payments related to hardware). "Product Disposables" comprised "any filter cylinder or similar disposable provided such disposable utilizes the Cytyc Technology, the FMS Technology or both." The Agreement noted somewhat cryptically that the term "Product Disposable[s] presently includes [the filter cylinder]."

Although the ThinPrep system functioned well, Cytyc struggled to perfect its imaging technology. Finally, it began to market the ThinPrep system without the computer imager. At some point, Cytyc developed a special microscope slide for use in the ThinPrep system and started to sell it, along with the other three disposable accessories, in a single bundle called the ThinPrep kit. The ThinPrep kit became a rousing commercial success, and Cytyc emerged as a leader in the market for cervical cancer screening systems.

For some period of time, Cytyc made quarterly royalty payments to DEKA pursuant to the Agreement. In November of 2001, however, Cytyc notified DEKA of its belief that, for an earlier

three-year period, it had calculated DEKA's royalties too generously. In staking out this position, Cytyc posited that the Agreement entitled DEKA to royalties only on sales of the filter cylinder and not on sales of the other three disposable accessories included in the ThinPrep kit. Cytyc further informed DEKA that, consistent with this reading of the Agreement, it had computed the royalties referable to filter cylinder sales in accordance with the relative cost of the kit components (the relative cost ratio method). DEKA disputed both Cytyc's overpayment claim and its method for figuring royalties. In DEKA's view, the Agreement required Cytyc to pay a flat one percent royalty on net sales of all disposable accessories.

The parties attempted on at least two occasions to resolve their differences. At one such meeting, Cytyc's chief financial officer threatened that if DEKA continued to resist Cytyc's royalty calculation method, he would "manipulate" the cost data and suppress future royalties.

The Agreement gave DEKA the right to commission an independent audit of Cytyc's books should questions arise about the amount of royalty payments due. When the parties' negotiations stalled, DEKA exercised this prerogative. The final audit report covered the period from January of 1996 through September of 2002. The auditors described Cytyc's relative cost ratio method of calculating royalties as "unusual and uncommon" and found that,

-5-

even under this unorthodox approach, Cytyc had underpaid DEKA. The auditors further concluded that if the Agreement required the payment of royalties on the net sales of all disposable accessories contained in the ThinPrep kits, the amount of the underpayment would exceed $4,000,000 for the audit period alone.

The Agreement stipulated that disputes between the parties would be subject to binding arbitration. Armed with the audit report, DEKA served a demand for arbitration. It claimed, inter alia, that Cytyc had breached the Agreement by failing to pay royalties on the net sales of all the disposable accessories or, alternatively, by allocating royalties referable to the filter cylinder based on the relative cost ratio method.

A three-member arbitration panel held an evidentiary hearing that focused on the interpretation of the term "Product Disposables" and the appropriate method for calculating DEKA's royalties. The parties' positions were in sharp contrast. On the one hand, DEKA maintained that the term "Product Disposables" included any and all disposable accessories that used the Cytyc or FMS technology in the creation of a sample slide (a reading that, in effect, mandated the payment of royalties with respect to sales of all four disposable accessories bundled in the ThinPrep kit). DEKA also asserted that royalties should be gauged by the net sales, rather than the relative costs, of the kit components. On the other hand, Cytyc argued that the term "Product Disposables"

covered only the filter cylinder, not the other three disposable accessories bundled in the ThinPrep kit, and that royalties should be computed by using the relative cost ratio method.

To bolster its position, Cytyc proffered two kinds of adscititious evidence. The first was a set of three letters between the parties, exchanged prior to the execution of the Agreement, which purported to document an intent to exclude sales of Cytyc's preservative solution from DEKA's royalty base. The second comprised testimonial and documentary evidence suggesting that, over a period of years, Cytyc had disclosed its use of the relative cost ratio method to DEKA without eliciting any objection.

Shortly after the conclusion of the hearing, one of the arbitrators died. In March of 2005, the remaining two arbitrators issued a partial final award (the PFA). The Agreement provided that New Hampshire law would be controlling and, in the PFA, the arbitrators ruled that the New Hampshire statute of limitations barred DEKA's breach of contract claim for periods prior to November 17, 2000. As to subsequent periods, the linchpin of the arbitrators' decision was a finding that:

> FMS Technology is a system; it is not a specific product. It is the operation of a system on certain components. In this particular situation the components are the four units . . . : the filter, the collection device, the vial and the slide. . . . [T]hese units . . . are worthless by themselves, but when put together and governed by this patented system, the FMS technology, [they] become[] enormously valuable.

The arbitrators coupled this finding with two other findings: that the FMS technology was the "key" component of the ThinPrep system and that the four disposable accessories were "integrated by design and function in order to work."

After making these findings, the arbitrators addressed the contested contractual provision:

> The phrase "or similar disposable provided such disposable utilizes the Cytyc Technology, the FMS Technology or both" cannot be read to be restricted to only the filter. The very next sentence, which reads "Product Disposable[s] presently includes [the filter cylinder]," must mean that the term "Disposables" includes the other disposables in the Kit and any improvements or modifications.

In line with this parsing of the Agreement's text, the arbitrators determined that Cytyc's relative cost ratio method for figuring royalties was "contrary to the [A]greement" and that "the parties never intended that royalties would be paid on parts of the Kit rather tha[n] the Kit as a whole." Based on these serial determinations and the plain language of the Agreement, the arbitrators concluded that the term "Product Disposables" covered all four of the disposable accessories bundled in the ThinPrep kit and, accordingly, that the Agreement entitled DEKA to royalties on the proceeds derived from the net sales of the kits.

Although the PFA resolved the central issues in dispute, the panel believed that it could not make an accurate calculation of DEKA's damages on the record as it stood. Consequently, the

arbitrators ordered the parties to submit proposed damage computations within twenty-five days and authorized them to supplement the record to the extent necessary to buttress these computations.

The parties submitted widely disparate damage estimates. In large part, that disparity arose because Cytyc claimed a right to offset DEKA's royalties by deducting commissions allegedly paid on the sales of ThinPrep products, whereas DEKA argued that, in the language of the Agreement, Cytyc was entitled to deduct only those commissions that were "actually stated on a customer invoice."

In their ensuing final award, the arbitrators once again sided with DEKA. They found that "[t]he only customer invoices in the record are devoid of any . . . statement of commissions." Largely for that reason, the arbitrators' final award set DEKA's damages in the amount of $7,524,168, plus interest of $563,645 — amounts that pretty much tracked what the panel characterized as the "persuasive" calculations made by DEKA's accountants. The arbitrators also ordered Cytyc to bear the expenses of both the audit and the arbitration, and to reimburse DEKA $1,000,000 for attorneys' fees and costs.

Having lost at virtually every turn, Cytyc asked the district court to vacate the arbitral award. DEKA cross-moved for confirmation of the award. Ruling ore sponte, the district court

rejected Cytyc's importunings and granted DEKA's motion. This timely appeal followed.

## II. DISCUSSION

On appeal, Cytyc asseverates that the arbitrators (i) neglected to interpret the Agreement or, alternatively, devised an interpretation that was unfounded in reason and fact (and, thus, that failed to draw its essence from the Agreement); (ii) manifestly disregarded applicable New Hampshire law; and (iii) refused to consider material evidence referable to the issue of damages.[1] After limning the applicable standard of review, we address each of these asseverations.

### A. **Standard of Review**.

In an action to vacate or confirm an arbitral award, we typically review the district court's decision de novo.[2] See, e.g., Supervalu, 212 F.3d at 65. The authority of a federal court to disturb an arbitration award is tightly circumscribed. While

---

[1]In its opening brief, Cytyc hinted at additional challenges based on the untimely death of the third panel member, the interest calculation, and the award of attorneys' fees. Because Cytyc failed to develop these embryonic arguments, we treat them as stillborn. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (explaining that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

[2]The standard of review may be more nuanced where the district court has conducted an evidentiary hearing and made findings of fact. See First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 947-48 (1995). The district court made no such findings in this case.

the award must "draw its essence from the contract" that underlies the arbitration proceeding, courts will deem that benchmark achieved as long as the arbitrators are "even arguably construing or applying the contract and acting within the scope of [their] authority." United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 38 (1987). That a reviewing court is convinced that the arbitrators committed error — even serious error — does not justify setting aside the arbitral decision. Id. This remains true whether the arbitrators' apparent error concerns a matter of law or a matter of fact. Advest, Inc. v. McCarthy, 914 F.2d 6, 8 (1st Cir. 1990).

None of this means, however, that arbitral awards are utterly impregnable. Although courts "do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts," Misco, 484 U.S. at 38, there are nevertheless a few exceptions to the general rule that arbitrators have the last word. One set of exceptions is codified in the Federal Arbitration Act (FAA). The operative provision, section 10(a) of the FAA,[3] authorizes vacatur only in cases of

---

[3]The FAA authorizes a federal court to vacate an arbitral award:

> (1) Where the award was procured by corruption, fraud, or undue means.
> (2) Where there was evident partiality or corruption in the arbitrators, or either of them.
> (3) Where the arbitrators were guilty of

"specified misconduct or misbehavior on the arbitrators' part, actions in excess of arbitral powers, or failures to consummate the award." Advest, 914 F.2d at 8.

A second set of exceptions flows from the federal courts' inherent power to vacate arbitral awards. See id. This authority is very narrow. One manifestation of it, usually (but not exclusively) associated with labor arbitration, arises when an award contravenes the plain language of the applicable contract. See Bull HN Info. Sys., Inc. v. Hutson, 229 F.3d 321, 330-31 (1st Cir. 2000) (recognizing the applicability of this principle outside the labor context). Another manifestation arises in those rare cases in which it is clear from the record that the arbitrators cavalierly disregarded applicable law. Advest, 914 F.2d at 9.

At the expense of carting coal to Newcastle, let us make one thing perfectly clear. Despite the existence of these

> misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.
> (4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a). An additional provision of the FAA, 9 U.S.C. § 11, allows a federal court to correct "evident" and "material" arithmetic or descriptive errors in arbitral awards. Cytyc has not invoked section 11 here.

-12-

exceptions, great deference remains the general mode of approach to judicial review of arbitral awards.  Id. at 8.

### B.  **The Merits**.

Against this backdrop, we turn to Cytyc's asseverational array.

**1.  Misinterpretation of the Agreement**.  Cytyc's most bruited contention is that the panel neglected to offer any interpretation of the text of the Agreement or, alternatively, that the panel's interpretation of the term "Product Disposables" is unfounded in reason and fact (and thus, in either event, that the arbitral award fails to draw its essence from the Agreement).  If either part of that binary charge were correct, vacation would be an appropriate remedy.  See Misco, 484 U.S. at 38.  Cytyc, however, has failed to carry its heavy burden of substantiating the charge.

Cytyc's claim that the panel neglected to interpret the Agreement is jejune.  We must uphold the arbitrators' decision as long as they were even "arguably" construing the Agreement.  Id. That standard is abundantly satisfied here.  The panel's decision (portions of which are quoted above) makes manifest that the arbitrators pondered the pertinent language of the Agreement and construed that language in accordance with the parties' discernible intent.  That is contract interpretation, pure and simple.  See Robbins v. Salem Radiology, 764 A.2d 885, 887 (N.H. 2000) (holding that, in reviewing a contract, a court must give the language "the

-13-

interpretation that best reflects the parties' intentions" at the time of contracting).

Cytyc's more robust claim is that the arbitrators' interpretation of the Agreement was flawed. Even under the highly deferential standard that constrains judicial review of arbitral awards, the moving party may establish entitlement to vacation of an arbitral award on a persuasive showing that the arbitrators' interpretation is contrary to the plain language of the contract. Bull HN Info. Sys., 229 F.3d at 330-31; Advest, 914 F.2d at 9. This configuration requires the movant to demonstrate that the award is "(1) unfounded in reason and fact; (2) based on reasoning so palpably faulty that no judge, or group of judges, ever could conceivably have made such a ruling; or (3) mistakenly based on a crucial assumption that is concededly a non-fact." Advest, 914 F.2d at 8-9 (citations and internal quotation marks omitted).

In this case, the plain language of the Agreement, when coupled with the arbitrators' factual findings, easily sustains the interpretation upon which the award rests. The Agreement defines "Product Disposables" as "any filter cylinder or similar disposable provided such disposable utilizes the Cytyc Technology, the FMS Technology or both." In what necessarily amounted to an explication of this provision, the panel supportably found that the FMS technology pervades the entire ThinPrep system and that the four disposable accessories are "systematically integrated" into that

-14-

system "by design and function." With certain exceptions (none relevant here), we are duty-bound to give effect to an arbitrator's findings of fact. Mercy Hosp., Inc. v. Mass. Nurses Ass'n, 429 F.3d 338, 344 (1st Cir. 2005). Doing so, we hold that the panel's finding that the term "any similar disposable [which] utilizes the Cytyc [or] FMS Technology" captures all the disposable accessories in the ThinPrep kit was not plainly erroneous, much less so unfounded in reason and fact as to justify judicial correction.

Cytyc's contrary argument relies heavily on correspondence which, it maintains, establishes the parties' shared intention to include only sales of filter cylinders in DEKA's royalty base. These letters cannot carry the weight that Cytyc loads upon them.

In the first place, the arbitrators' interpretation — with or without the letters — does not appear to be strained or chimercial. By its terms, the Agreement did not exclude any disposable accessory from the definition of "Product Disposables" and DEKA presented evidence that, early in the parties' course of dealing, Cytyc included the sales of all the disposable accessories in DEKA's royalty base.

Moreover, the letters, even if taken at face value, are far from dispositive. This is especially so since DEKA adduced evidence that any informal agreement to exclude sales of the preservative solution from the royalty base only covered sales of

-15-

the solution <u>unrelated</u> to the ThinPrep system.  This proof comported with documentation indicating that, at the time the parties executed the Agreement, Cytyc had not decided whether to sell the filter cylinder individually or in combination with the other disposable accessories.

In the second place, Cytyc asks us to draw an inference, based on nothing more than the panel's omission of any direct reference, that the arbitrators neglected to consider the letters.  This is whistling past the graveyard.  Arbitrators are not required to provide particularized reasons for their decisions.  <u>See</u> <u>Raytheon Co.</u> v. <u>Automated Bus. Sys., Inc.</u>, 882 F.2d 6, 8 (1st Cir. 1989).  It follows that an arbitrator's failure to comment upon a specific piece of evidence cannot support an inference that he failed to consider it.  <u>See</u> <u>Nat'l Cas. Co.</u> v. <u>First State Ins. Group</u>, 430 F.3d 492, 498-99 (1st Cir. 2005).

Third, and finally, the parties exchanged the correspondence in question months before the execution of the Agreement.  When signed, the Agreement itself not only omitted any mention of excluding sales of Cytyc's preservative solution from DEKA's royalty base but also contained an integration clause.[4]  Under

---

[4]The clause provided in relevant part:

> This Agreement constitutes the entire understanding of the parties with respect to the subject matter hereof and supersedes all prior understandings and writings relating thereto.

-16-

such circumstances, the arbitrators were not compelled to use the letters to vary the apparent meaning of the Agreement. Cf. Richey v. Leighton, 632 A.2d 1215, 1217 (N.H. 1993) (holding that even where a contract is not completely integrated, "parol evidence is admissible only to prove unexpressed terms that are not inconsistent with the writing").

Refined to bare essence, Cytyc's argument reduces to a frontal attack on the merits of the arbitral award. Such an attack is easily repulsed. It was the province of the arbitrators to scrutinize the language of the Agreement, weigh the conflicting evidence of the parties' intentions, and determine the dimensions of DEKA's royalty base. See Major League Baseball Players Ass'n v. Garvey, 532 U.S. 504, 509-10 (2001). Cytyc has advanced no sound justification for us to tamper with the arbitrators' resolution of those issues.

**2.** **Manifest Disregard of the Law**. An arbitrator, of course, cannot intentionally flout the law. See First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 942 (1995); Advest, 914 F.2d at 9. In its second assignment of arbitral error, Cytyc tries to repackage its misinterpretation claim as a manifest disregard of the law claim. It begins by citing evidence that, for a period of years, DEKA never objected to Cytyc's calculation of royalties in accordance with the relative cost ratio method. It then points to a New Hampshire statute providing that, with respect to contract

interpretation, "any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement."  N.H. Rev. Stat. Ann. § 382-A:2-208(1).  With this foundation in place, it blithely asserts that the panel must have disregarded the statute.  This assertion lacks force.

A party seeking to establish manifest disregard of the law sufficient to warrant setting aside an arbitral award must demonstrate that the arbitrators appreciated the existence and applicability of a controlling legal rule but intentionally decided not to apply it.  Advest, 914 F.2d at 10.  This tenet demands "some showing in the record, other than the result obtained, that the arbitrators knew the law and expressly disregarded it."  Id. (citation and internal quotation marks omitted).[5]

The record in this case contains no evidence that the panel appreciated the applicability of the New Hampshire statute and willfully ignored it.  Indeed, it is hopelessly unclear whether this provision, which appears in New Hampshire's version of Article 2 of the Uniform Commercial Code, governs agreements to license patented intellectual property.  See N.H. Rev. Stat. Ann. § 382-A:2-102

---

[5]In George Watts & Son v. Tiffany & Co., 248 F.3d 577 (7th Cir. 2001), the Seventh Circuit held that the manifest disregard of the law exception has been restricted to cases in which the arbitral award either requires the parties to violate the law or "does not adhere to the legal principles specified by contract, and hence [is] unenforceable under § (10)(a)(4)" of the FAA.  Id. at 581 (citing E. Assoc'd Coal Corp. v. UMW, Dist. 17, 531 U.S. 57 (2000)).  We need not decide today whether the exception has been limited to that extent.

-18-

(stating that "this Article applies to transactions in goods"). Given these deficiencies in Cytyc's proffer, the arbitral award cannot be said to have been rendered in manifest disregard of the law.

**3.** **Failure to Consider Material Evidence**. In a last-ditch effort to salvage its appeal, Cytyc takes issue with the arbitrators' refusal to discount DEKA's damage award by the amount of commissions allegedly paid on the sales of ThinPrep products. Specifically, Cytyc avers that the panel failed to allow it to introduce material evidence anent the deductibility of these commissions and, thus, that the award must fail under 9 U.S.C. § 10(a)(3) (authorizing vacatur when arbitrators are "guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy").

Cytyc's argument is vecordious. Notwithstanding ample opportunity during the evidentiary hearing and before the issuance of the PFA, Cytyc failed to produce any evidence relating to the payment or deductibility of sales commissions. To cinch matters, the panel afforded the parties a twenty-five day window after announcing the PFA within which to augment the record with evidence pertaining to the computation of damages. During that period, DEKA specifically requested Cytyc to furnish "appropriate documentation" substantiating its supposed payment of commissions and warned that it would ask the arbitrators to disallow any commission not

-19-

"actually stated on a customer invoice by Cytyc or [its] affiliates," as required by the Agreement.

Cytyc spurned the opportunity afforded by the arbitrators and turned a deaf ear to DEKA's warning; it produced neither a single invoice reflecting a commission nor a shred of evidence concerning the propriety of deducting unstated commissions. Given these missed opportunities, Cytyc cannot now be heard to complain that the panel followed the letter of the Agreement, refused to consider non-existent extrinsic evidence, and rejected Cytyc's damage computation. Arbitrators are, after all, not expected to be mind readers.[6]

## III. CONCLUSION

We need go no further. For the reasons elucidated above, we hold that Cytyc has failed to identify any legally cognizable basis for vacating the arbitral award. Accordingly, we uphold the district court's order of confirmation.


**Affirmed**.

---

[6]To be sure, Cytyc did make a motion for reconsideration after the arbitrators handed down their final award. In that motion, it promised to present expert evidence bolstering its theory of deductibility. This was clearly too little and too late, and we cannot fault the arbitrators for summarily denying the motion.