# United States Court of Appeals
## For the First Circuit

No. 06-2480

SHANK/BALFOUR BEATTY, a Joint Venture of
M.L. Shank, Co., Inc. and Balfour Beatty Construction, Inc.,

Plaintiff, Appellant,

v.

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS
LOCAL 99, a/k/a IBEW LOCAL 99,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

Before

Lynch and Howard, Circuit Judges,
and Young,* District Judge.

Mark T. Bennett, with whom Stephen J. Schultz and Marks,
Golia & Finch, LLP were on brief, for appellant.
Carly Beauvais Iafrate, with whom Gerard P. Cobleigh was on
brief, for appellee.

August 6, 2007

---

* Of the District of Massachusetts, sitting by designation.

**LYNCH**, **Circuit Judge**.  This labor arbitration case raises three issues.  The main issue is whether a grievance between one union and management over work assignment constitutes a "jurisdictional" dispute and so is explicitly excluded from arbitration under the terms of a collective bargaining agreement ("CBA").  On this issue, we affirm the district court's findings that (1) the question of arbitrability was an issue for the court to decide, not the arbitrator, and (2) the grievance was arbitrable because it was not a jurisdictional dispute -- only one union affirmatively laid claim to the work against management's assertions it could assign the work as it wished.  See Shank/Balfour Beatty v. Int'l Bhd. of Elec. Workers, No. CA 06-43 ML, 2006 WL 2707325, at *3-4 (D.R.I. Sept. 19, 2006).

We also affirm enforcement of the award and the remedy the arbitrator awarded the union, in the face of management's claim that the remedy violates the management rights section of the CBA.  However, while we leave in place the judgment against the joint venture which was a party to the agreement and the suit, we vacate judgment against one entity which was not a party to the case.

I.

Shank/Balfour Beatty ("Shank/BB") and International Brotherhood of Electrical Workers, Local 99 ("Local 99"), together with two other unions, are parties to a collective bargaining

-2-

agreement that provides for the arbitration of all disputes under the agreement that are not "jurisdictional dispute[s]."

Shank/BB is a joint venture of two corporations, M.L. Shank Co., Inc. and Balfour Beatty. In March 2002, Shank/BB and three unions signed a "Special Tunnel Agreement." This Agreement governed their relationship in constructing the Main Spine Tunnel and Ancillary Facilities Project for the Narragansett Bay Commission. The project's purpose is to dig a 16,000-foot-long tunnel, 26 feet in diameter, under the city of Providence, Rhode Island, to hold up to 60 million gallons of combined waste water pending processing. The three unions involved were Local 99, representing electricians, a union representing laborers, and a union representing operating engineers.

Section 7 of the Agreement, titled "Jurisdiction," provides that "[Shank/BB] shall assign jurisdiction for the work as follows: . . . In general, the Electricians shall have jurisdiction for performing electrical work required for manufacturing equipment and for construction of the work." Similarly, that section defines the work that falls within the jurisdiction of the operating engineers and of the laborers.

Section 7 also provides that "[t]here shall be no strikes, work stoppages, or slow-downs, or other disruptive activity, arising from any jurisdictional dispute." That section then provides for the resolution of jurisdictional disputes as

-3-

follows: "Should a jurisdictional dispute arise, the dispute shall be settled by the Unions themselves, and [Shank/BB] shall be bound by that settlement. . . . If the Unions cannot reach any settlement, [Shank/BB's] original assignment shall remain in effect."

By contrast, Section 11 of the Agreement mandates the use of a grievance procedure which culminates in binding arbitration to settle "[a]ny dispute arising from performance of this [Agreement]," but this procedure specifically does not apply to "a jurisdictional dispute."

The joint venture used a tunnel boring machine ("TBM"), approximately 255 feet long and weighing over 690 tons, to dig the tunnel. The TBM contained a series of electrical panels, inside of which were push-button motor starters, breakers, and other circuitry. On the front of the door to each of these panels was a warning sign indicating that the circuitry within had multiple voltage supply sources, including 480-volt sources, and stating "Electrical Equipment, Authorized Personnel Only."

In March 2004, Local 99 called a meeting with the company and the other unions, claiming that "electrical work" was being done by members of the other unions. The company took the position that the disputed work, including "pushing start-stop and breaker reset buttons for . . . TBM operating functions," was not "electrical work" under the Special Tunnel Agreement, and that "any

craft could do" this work.  The laborers' and operating engineers' unions agreed with the company's assessment.  That meeting was convened under the CBA procedures for jurisdictional disputes.

In June 2004, the company implemented a third shift of work for the project.  Unlike the first two shifts, no electricians were assigned to the third shift, although electricians were sometimes called out to do work on that shift.  Patrick Brady, a Local 99 steward, became aware that non-electricians on the third shift "were being instructed to go into the switch gear and throw breakers on and off" and were otherwise performing what Brady considered to be electrical work.

On August 24, 2004, Brady told the third-shift workers as a group "that it was very dangerous for them to be in that equipment" and that non-electricians "should [not] be doing the electrical work."  According to Brady, Donald Umling, a foreman for the third shift and a member of the operating engineers' union, responded that he was "doing the electrical work" and would "continue doing the electrical work," particularly if there was no electrician around.

In February 2005, while Brady and another electrician were running a cable across the top of the TBM, one of the breakers on the machine switched off, thereby shutting down the machine. The two electricians started to track down the problem.  According to Brady, Umling began "randomly throwing breakers" to try to

restart the machine. At some point, Umling threw the breaker that had switched off, and the machine started up while the electricians were still working on it. According to Brady, had one of the electricians been working in the panel that "kicked in," that person could have been electrocuted.

On February 14, 2005, Local 99 filed a grievance about the incident with Shank/BB. Local 99 alleged:

> Electrical work on the [tunnel project] has been done, and is continuing to be done[,] by unlicensed 3rd shift personnel other than members of [Local 99] in violation of the Special Tunnel Agreement and The State of Rhode Island licensing laws, with the knowledge and apparent approval of Michael Shank, Managing Partner, [Shank/BB].

On February 25, the union made a corresponding demand for arbitration of the dispute. Shank's initial position in response to Local 99's grievance was that the dispute was not a jurisdictional dispute under the CBA. In a pre-arbitration letter, Shank stated: "[T]he incident you describe does not involve a jurisdictional dispute under Article 7. Neither [the operating engineers' union], nor [Shank/BB], contend that any craft except IBEW Local 99 has jurisdiction for performing electrical work."

The parties appeared before an arbitrator on May 6, 2005. At that hearing, the company took the position that the matter was not arbitrable because it was a jurisdictional dispute. The company further argued that the question of whether the matter was a jurisdictional dispute was a question of substantive

arbitrability, and thus beyond the power of the arbitrator to decide. The arbitrator ruled against the company on both points and later took evidence on the merits at a hearing on June 6. The company participated in the latter hearing subject to preserving its right to challenge both the arbitrability of the matter and the arbitrator's authority to decide the question of arbitrability.

On October 10, 2005, the arbitrator issued an award and written decision in favor of Local 99. The arbitrator first held that the arbitration clause of the Special Tunnel Agreement was broad enough to grant him the authority to decide arbitrability. The arbitrator also suggested that Shank/BB may have forfeited its right to a "judicial interpretation of the arbitration clause" by not seeking a court determination "in the first instance." The arbitrator analogized to the rule that "failure to promptly appeal a denial of arbitration will, if prejudicial to the opposing party, operate to forfeit the demanding party's right to arbitration." Franceschi v. Hosp. Gen. San Carlos, Inc., 420 F.3d 1, 4 (1st Cir. 2005).

The arbitrator then found that the matter was arbitrable because it was not a jurisdictional dispute. Citing the National Labor Relations Board's usage of the term, the arbitrator described a jurisdictional dispute as "one between two unions over a proper allocation of work." He described the complaint before him as being instead "that Mr. Umling, alone, is performing electrical

-7-

work which he is not capable of performing safely." According to the arbitrator, the dispute centered on Umling's actions "as a member of management," and his membership in the operating engineers' union was "inconsequential."

Finally, on the merits of the dispute, the arbitrator found that "the same facts which compel a finding of arbitrability are equally persuasive on the question raised by the grievance." In particular, he found the claim of "unsafe work conditions" to be "well supported by the evidence." For a remedy, the arbitrator ordered the company to assign an electrician to the third shift going forward and to pay back pay and benefits corresponding to such a third-shift electrician starting from August 21, 2005.

On January 9, 2006, Shank/BB filed a motion to vacate the arbitral award in superior court in Rhode Island. Shank/BB argued the arbitrator erred in deciding the issue of arbitrability and that the remedy exceeded the scope of his authority. Local 99 removed the case to the federal district court in Rhode Island and filed a cross-motion to confirm the award. Shank/BB and Local 99 stipulated to undisputed facts and exhibits.[1]

---

[1]    Shank/BB is not entitled to all inferences in its favor on either of the cross-motions, as might be the case if this were simply an ordinary summary judgment case. The case was presented to the court on stipulated facts, and those facts were sufficient for the court to enter judgment. Neither party requested a jury trial, and we understand the parties to have submitted the issue to the district court on a case stated basis. See Garcia-Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 643-45 (1st Cir. 2000). Still, the outcome would be the same in any event.

On September 19, 2006, the district court granted Local 99's motion to confirm and simultaneously denied Shank/BB's motion to vacate. The court found that the arbitrator had erred in deciding the issue of arbitrability himself. The court also found that Shank/BB had properly preserved its objections to arbitrability. On de novo review, however, the court agreed that the grievance was not a jurisdictional dispute and hence was arbitrable. On the merits, the court applied a deferential review of the arbitral award and found no basis to disturb it. The court then entered judgment "against the Plaintiffs, Shank/Balfour Beatty and Balfour Beatty Construction, Inc."

Following the entry of judgment, Shank/BB filed a motion to amend the judgment "pursuant to Federal Rules of Civil Procedure 59(e) and 60(a) and 60(b)." Shank/BB argued that the district court should have vacated the arbitrator's award to the extent it decided the issue of arbitrability. Shank/BB also argued that Balfour Beatty should be deleted from the judgment because it was not a party in the case.

On October 16, 2006, the district court denied Shank/BB's motion in its entirety. The court found no error in confirming the arbitrator's award, as the court had come to the same conclusion as the arbitrator on de novo review of the issue of arbitrability. Regarding Balfour Beatty, the court held that "[i]t was Plaintiff

itself that named Balfour Beatty Construction as a Plaintiff in this action."

II.

Shank/BB's primary challenge is to the district court's determination that the grievance was not a jurisdictional dispute and was therefore arbitrable.  Our resolution of this issue of arbitrability turns only on questions of law, as to which we review the district court's determinations de novo.  See First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 947-48 (1995); Coady v. Ashcraft & Gerel, 223 F.3d 1, 10 (1st Cir. 2000).

A dispute over whether an arbitration provision applies to a particular controversy raises an issue of substantive arbitrability that is presumptively for the courts, not the arbitrator, to decide.  See Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 84 (2002).  The issue is one for the arbitrator only if "the parties clearly and unmistakably [so] provide."  AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 649 (1986); see also First Options, 514 U.S. at 944.  In this circuit, the "'clear and unmistakable evidence'" standard is a "high one." Marie v. Allied Home Mortgage Corp., 402 F.3d 1, 14 (1st Cir. 2005) (quoting First Options, 514 U.S. at 944).

The parties agree that jurisdictional disputes are plainly not subject to arbitration.  They disagree about what constitutes a jurisdictional dispute.  Here, that is an issue for

-10-

the court, and the arbitrator was in error in assuming the authority to answer that question.[2]

The company initially argues that the 2005 grievance is a jurisdictional dispute because it is simply a continuation of an early 2004 jurisdictional dispute about "electrical work" which was resolved at a meeting of the three unions and management. This 2004 dispute utilized the Section 7 procedures for resolution of jurisdictional disputes. The company presented letters from the two other unions which essentially endorsed management's view that "electrical work" did not include work which did not require the skill of an electrician and so could be assigned to employees represented by the other two unions.

The district court held that the company had not shown that the current matter is sufficiently related to, or a continuation of, the 2004 matter. We agree. At the 2004 meeting, the operating engineers' union and the laborers union merely agreed with management's view of what constituted electrical work. That meeting predated Shank/BB's imposition of a third shift, and it

---

[2]     Shank/BB did not waive its right to challenge arbitrability by participating in the hearing on the merits after it raised the arbitrability issues before the arbitrator and the arbitrator ruled against the company. See Tejidos de Coamo, Inc. v. Int'l Ladies' Garment Workers' Union, 22 F.3d 8, 14 (1st Cir. 1994). Contrary to the arbitrator's suggestion, the rule in Franceschi does not apply in this context. Shank/BB had no obligation to seek a stay of arbitration in court, and indeed, such a stay cannot be granted absent a showing of "substantial and irreparable injury." Id. at 13-15.

-11-

also predated the incident with Umling.  No similar meeting was held in 2005.

The real starting question is how to define the term "jurisdictional dispute."  We reject Shank/BB's contention that the Agreement itself provides the express definition of the term "jurisdictional dispute."  No such definition appears in the Agreement.  Shank/BB argues that "jurisdictional dispute" must refer to any dispute over the company's assignment of work.  This is not the only definition consistent with the Agreement, nor is it the most plausible one, as we explain later.

In the absence of an unambiguous definition of "jurisdictional dispute" in the Agreement, we start by looking to the NLRB's usage of that term, as that represents the custom and practice within the trade.[3]  See, e.g., Int'l Union of Operating

---

[3]     Section 8(b)(4)(D) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4)(D), makes it an unfair labor practice for a union to strike with the object of

> forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the [NLRB] determining the bargaining representative for employees performing such work.

Section 10(k), 29 U.S.C. § 160(k), provides that "[w]henever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(D) of section 8(b), the [NLRB] is empowered and directed to hear and determine the dispute out of

Eng'rs, Local 103 v. Ind. Constr. Corp., 910 F.2d 450, 453 (7th Cir. 1990).  "Custom and usage within an affected industry or workplace can be important aids to the construction of a contract." Quinn v. City of Boston, 325 F.3d 18, 31 (1st Cir. 2003); see also Drans v. Providence Coll., 383 A.2d 1033, 1038 (R.I. 1978).  In the labor field, the phrase "jurisdictional dispute" is a "term of art" that generally refers to the NLRB's usage.  Huber, Hunt & Nichols, Inc. v. United Ass'n of Journeymen & Apprentices of the Plumbing & Pipefitting Indus., Local 38, 282 F.3d 746, 748 n.2 (9th Cir. 2002).

In the context of an NLRB proceeding, a classic jurisdictional dispute is "a dispute between two or more groups of employees over which is entitled to do certain work for an employer."  NLRB v. Radio & Television Broad. Eng'rs Union, Local 1212 (CBS), 364 U.S. 573, 579 (1961).  The employer is ordinarily caught in the middle between the rival union groups of employees.  See id. ("[I]n most instances, [the dispute] is of so little interest to the employer that he seems perfectly willing to assign work to either [group of employees] if the other will just let him alone.").  One common scenario involves collective bargaining agreements (like this one) which promise certain types of work to

which such unfair labor practice shall have arisen."  The dispute in a proceeding under section 10(k) is referred to as a "jurisdictional dispute."  NLRB v. Radio & Television Broad. Eng'rs Union, Local 1212, 364 U.S. 573, 579 (1961).

-13-

certain unions.  At times, the dispute comes from hybrid work that appears to fall within more than one jurisdictional grant.  <u>See</u> <u>J.F. White Contracting Co.</u> v. <u>Local 103 Int'l Bhd. of Elec.</u> <u>Workers</u>, 890 F.2d 528, 528-29 (1st Cir. 1989).  The employer's main interest in such jurisdictional disputes is to avoid being subject to inconsistent obligations.  <u>See</u> <u>id.</u> at 530.

For a jurisdictional dispute to exist, competing groups (usually unions) must make claims to do the work at issue.  <u>See</u> <u>NLRB</u> v. <u>Plasterers' Local Union No. 79</u>, 404 U.S. 116, 134-35 & n.30 (1971).  If only a single union claims the work as its own, then the dispute is ultimately between the union and management, not among rival groups of employees.  <u>Id.</u> at 134 n.30 (citing <u>Carpet,</u> <u>Linoleum & Soft Tile Layers, Local 1905</u>, 143 N.L.R.B. 251, 255-56 (1963)).  Furthermore, the existence of a jurisdictional dispute may be eliminated if all of the unions but the one claimant union clearly and unequivocally disclaim all interest in the work and compensation.  <u>Local 150, Int'l Union of Operating Eng'rs</u>, 308 N.L.R.B. 1005, 1006 (1992).

This case is at neither of these clearly established end posts.  Only one union, Local 99, is affirmatively claiming the work as its own.  The other two unions did not make an affirmative claim.  But at the same time, they did not affirmatively relinquish any claim to the work that management might send their way.

The company's position at the 2004 meeting was only that the work was "not electrical work" and hence that "any craft could do it." The company never stated that the work affirmatively was operating engineers' work or laborers' work, nor is there any indication that these unions took such positions.[4] Indeed, the company's initial response was that this issue did not involve a jurisdictional dispute because neither of the other unions "contend that any craft except IBEW has jurisdiction for performing electrical work." Similarly, Umling never even arguably claimed

---

[4] Shank/BB nonetheless suggests that an affirmative claim for work need not be explicit and that the actual performance of the work may be sufficient. Performance of the work might in some instances be "evidence" of a claim on the work that creates a jurisdictional dispute. See, e.g., Int'l Longshoremen's & Warehousemen's Union, Local 62-B v. NLRB (Alaska Timber), 781 F.2d 919, 924-26 (D.C. Cir. 1986); Int'l Longshoremen's & Warehousemen's Union, Local 14 (Sierra Pacific), 314 N.L.R.B. 834, 836 (1994), aff'd 85 F.3d 646, 651-53 (D.C. Cir. 1996). On the facts of this case, however, any such evidence is significantly in tension with the other evidence, including the evidence that no other union ever claimed an affirmative entitlement to the disputed work. Cf. Alaska Timber, 781 F.2d at 925 (explaining that the mere fact that one group is performing the work, coupled with the fact that another group is demanding the work, is insufficient to create a jurisdictional dispute). Moreover, the NLRB decision Shank/BB relies on was one in which non-unionized workers "claimed" the work through performance. See Sierra Pacific, 314 N.L.R.B. at 837; see also Int'l Union of Operating Eng'rs, Local 926, 254 N.L.R.B. 994, 994, 996 (1981) (non-unionized employees "claimed" the work through performance); Int'l Longshoremen's & Warehousemen's Union, Local No. 8, 231 N.L.R.B. 179, 179-80 (1977) (same); Sheet Metal Workers Local Union No. 54, 203 N.L.R.B. 74, 76 (1973) (same). Yet when unionized workers merely perform the work, the lack of an affirmative claim is more probative, as such workers have more established channels to voice affirmatively such claims if they are so inclined. Here, only Local 99 was making an affirmative claim to the work.

the work on behalf of the operating engineers. Rather, he insisted only that if no electrician was around, then he could do the work himself.[5]

The Agreement itself makes it implausible that the parties intended this to be a "jurisdictional dispute." That follows from the procedure set up to resolve jurisdictional disputes. The Agreement provides that jurisdictional disputes "shall be settled by the Unions themselves," and that in the absence of such a settlement, Shank/BB's "original assignment shall remain in effect." Thus, the company effectively acts as the last word on any jurisdictional disputes among the competing unions if the unions cannot resolve their claims amongst themselves. This makes sense in a traditional dispute in which the company is caught between competing unions' claims and the company itself is largely a neutral bystander. But it hardly makes sense if the dispute is actually one by a single union against the company.

Here, the dispute is best understood as essentially one by a single union against the company. To the extent the laborers' and the engineers' unions were taking any position at all, that position was simply that the company should have a free hand in assigning the disputed work to whomever it wishes. The contrary

---

[5] We do not rely on any reasoning based on Umling's arguable status as a supervisor, a status that one might view as overriding his status as a member of the operating engineers covered by the contract.

-16-

position of Local 99 was that the company should not have a free hand. Thus unlike a traditional jurisdictional dispute in which rival unions are advancing their own positions, here Local 99's "rivals" were advancing the company's position (albeit a position that might have benefits for these unions). Such a dispute was not meant to be left to the company as ultimate arbiter, and thus such a dispute is not "jurisdictional" within the meaning of the Agreement.[6]

### III.

Our review of the resulting remedial award is extremely deferential.

Shank/BB does not really challenge the finding by the arbitrator on the merits that the work was electrical work. "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority," we must uphold the award, even if we are "convinced he committed serious error." United Paperworkers Int'l Union v. Misco, Inc., 484 U.S.

---

[6] Some cases have concluded that a dispute is not "jurisdictional" when the dispute is of management's "own making." Alaska Timber, 781 F.2d at 924. We do not adopt such a formulation. Many true jurisdictional disputes among unions will initially be of management's making. This commonly used language may, however, be no more than a shorthand way of saying the dispute is actually between one union and management and not among rival unions. Cf. Recon Refractory & Constr. Inc. v. NLRB, 424 F.3d 980, 987-90 & n.12 (9th Cir. 2005). Because we find no jurisdictional dispute, on this record, within the meaning of the contract, we need not address further any exception for disputes of the company's "own making."

29, 38 (1987). Under this standard, it is clear that the arbitrator's award must be upheld.[7] The company's attack goes primarily to the remedial aspect of the award.

We reject the company's initial argument that the arbitrator's error in claiming authority to decide arbitrability somehow infected his decision on the award. The argument is that since the arbitrator exceeded his authority in addressing the arbitrability issue, everything he did must be vacated. That would lead to the senseless and inefficient result of sending the matter back to the arbitrator to redo the arbitration he had just done properly, even if he was wrong about who should decide the question of arbitrability. It does not matter that the arbitrator, in his decision on the merits, referred to his reasoning on the question of arbitrability. See Cytyc Corp. v. DEKA Prods. Ltd. P'ship, 439 F.3d 27, 34 (1st Cir. 2006) ("Arbitrators are not required to provide particularized reasons for their decisions."); Boston Med. Ctr. v. SEIU, Local 285, 260 F.3d 16, 21 n.4 (1st Cir. 2001) ("We have upheld arbitrator[s'] awards even where we expressed doubt about the arbitrator's rationale.").

---

[7] There was ample evidence before the arbitrator that Umling and others under him had been performing work that could be construed as "electrical work" under the Agreement. In particular, the arbitrator reasonably found that working in the panels marked "Electrical Equipment" could be "electrical work," particularly when the failure to limit this work to electricians had led to "unsafe work conditions." Moreover, the arbitrator was entitled to credit the testimony that Umling himself had stated that he was performing "electrical work."

Shank/BB attacks the arbitrator's choice of remedy as inconsistent with the section of the Agreement that reserves to management the right to "assign[] the numbers of employees it considers necessary for any operation or crew." Our review of an arbitrator's chosen remedy is also highly deferential, and "where it is contemplated that the arbitrator will determine remedies for contract violations that he finds, courts have no authority to disagree with his honest judgment in that respect." Misco, 484 U.S. at 38.

Here, the arbitrator was faced with two provisions in the Agreement that were potentially at odds with each other. One reserved electrical work to electricians; the other reserved to management the determination of the minimum number of employees required for the work. It was the arbitrator's role to decide how to resolve these competing provisions. The apparent rationale for the arbitrator's choice of remedies is that, under the circumstances, the minimum number of electricians needed on the third shift was one, and that the third shift should have had an electrician assigned to it from the start. This led to the generous monetary award of one electrician's pay, for the past, to the Union, as well as an order to assign an electrician prospectively. We have no basis to disturb such an interpretation of the Agreement. See Airline Pilots Ass'n, Int'l v. Pan Am. Airways Corp., 405 F.3d 25, 31-32 (1st Cir. 2005).

IV.

Shank/BB, the joint venture, correctly argues that the district court erred in entering judgment against Balfour Beatty and in denying Shank/BB's post-trial motion to vacate that judgment. Rule 60(b)(4) allows a district court to grant relief from a judgment that is "void." Although denial of a Rule 60(b) motion is normally reviewed for abuse of discretion, a district court has no discretion when deciding a motion brought under Rule 60(b)(4) "because a judgment is either void or it is not." See Fafel v. DiPaola, 399 F.3d 403, 409-10 (1st Cir. 2005) (quoting Honneus v. Donovan, 691 F.2d 1, 2 (1st Cir. 1982)) (internal quotation marks omitted). Accordingly, our review is de novo. Id.

Balfour Beatty appeared in the caption of the original state court complaint only as a member of the Shank/BB joint venture, not as a party in its own right. This caption was maintained when the case was removed to federal district court, but the typeface on the notice of removal may have suggested that Balfour Beatty was a separate party, and some of Local 99's filings listed Balfour Beatty as a separate party. The company's filings contained captions that were consistent with its original one-plaintiff complaint, and Balfour Beatty never actually appeared in the case as a party.

A judgment cannot be entered against one who is not a party to the case. See Metro. Prop. & Cas. Ins. Co. v. Shan Trac,

-20-

Inc., 324 F.3d 20, 25 (1st Cir. 2003).  Moreover, joint ventures are treated as partnerships under Rhode Island law, see Scully Signal Co. v. Joyal, 881 F. Supp. 727, 740 (D.R.I. 1995), and "Rhode Island's partnership law [does not] authorize[] the entry of a personal judgment against an unnamed and unserved partner in an action against a partnership," Nisenzon v. Sadowski, 689 A.2d 1037, 1049 (R.I. 1997).  Thus, Balfour Beatty did not become a party solely by virtue of being a member of the Shank/BB joint venture.[8]

When judgment is entered against an entity never properly served as a party to the case, the judgment is "void" within the meaning of Rule 60(b)(4).  See M & K Welding, Inc. v. Leasing Partners, LLC, 386 F.3d 361, 364-65 (1st Cir. 2004).  We see no reason why the result should differ when judgment enters against an entity that was never even a party in the first place.

V.

The judgment of the district court against Balfour Beatty is vacated and the case is remanded with instructions that Balfour

---

[8]      The complaint identifies both individual partners as California corporations, and the record is silent as to how, when, or where the joint venture was formed.  Shank/BB's brief nonetheless assumes that Rhode Island law governs, and Local 99 appears not to dispute this.  In any event, California law is not appreciably different.  See Weiner v. Fleischman, 816 P.2d 892, 895 (Cal. 1991) (explaining that partnerships and joint ventures are "virtually the same" for legal purposes); Cal. Corp. Code § 16307(c) ("A judgment against a partnership is not by itself a judgment against a partner.").

Beatty be deleted from the judgment.  In all other respects, the judgment is <u>affirmed</u>.  Costs are awarded to Local 99.