**HARPER INSURANCE LIMITED, River Thames Insurance Company Limited, and Guildhall Insurance Company Limited, Petitioners,**

v.

**CENTURY INDEMNITY COMPANY, Respondent.**

No. 10 Civ. 7866(NRB).

United States District Court, S.D. New York.

July 28, 2011.

ther party would be unduly burdened if the Court granted the motion—of a Rule 60(b)(6) motion.

Brian E. O'Donnell, Riker, Danzig, Scherer, Hyland & Perretti LLP, New York, NY, argued, for Petitioners.

Christine G. Russell, (argued), Ellen K. Burrows, Brendan D. McQuiggan, White & Williams LLP, Philadelphia, PA, Andrew T. Hamelsky, White & Williams LLP, New York, NY, for Respondent.

## MEMORANDUM AND ORDER

NAOMI REICE BUCHWALD, District Judge.

Petitioners Harper Insurance Limited, River Thames Insurance Company Limited, and Guildhall Insurance Company Limited are London market companies ("petitioners" or "LMCs"). They bring this action seeking to vacate an arbitration award granted in favor of Century Indemnity Company ("Century"). For the following reasons, LMCs' petition is denied, and Century's cross-petition to confirm the award is granted.

## FACTS

We briefly summarize only those facts essential to our conclusion. Petitioners are a subset of a larger group of London Market Reinsurers ("LMRs") which were parties to a reinsurance [1] contract, Treaty 101

---

**1.** Petitioners define reinsurance as a "transaction whereby the reinsurer, for a consideration, agrees to indemnify the ceding company against all or part of the loss which the latter may sustain under the policy or policies which it has issued." Mem. of Law. in Supp.

(the "Agreement"), with Century. The Agreement was effective from January 1, 1965 through December 31, 1967. Ex. 1 to O'Donnell Cert. Among other things, the Agreement obligated LMRs to indemnify Century for certain levels of liability arising out of asbestos bodily-injury lawsuits. The Agreement did not include a Reports and Remittances clause dictating when claims must be compensated by petitioners.[2] Rather, the Agreement directed that the "liability of the Reinsurers shall follow that of the Company in every case" and that "all payments of claims ... in which this reinsurance is involved shall be binding upon the Reinsurers, who shall be bound to pay or allow, as the case may be, their proportion of such payment...." Ex. 1 to O'Donnell Cert. at Art. VII, VIII. The Agreement contained a broad arbitration clause which stated that the arbitrators "shall interpret this Agreement as an honorable engagement and shall make their award with a view to effecting the general purpose of this Agreement in a reasonable manner, rather than in accordance with a literal interpretation of the language." *Id.* at Art. XII. The clause also mandated that the "arbitration law of New York State shall govern such arbitration." *Id.*

By the early 2000s, an "unanticipated flood" of asbestos bodily-injury claims "threatened to bankrupt ... insurers and reinsurers." Mem. of Law in Supp. of Pet. at 4 n. 4; Ex. 9 to O'Donnell Cert. at 11. In response, LMRs instituted a program in which Century would have to meet certain Reinsurance Documentation Requirements ("RDRs") in order to receive indemnification. Century believed that these unilaterally-imposed requirements were extra-contractual and a departure from the parties' long course of dealing. Mem. of Law in Opp'n at 5. Eventually, due to a "considerable bottleneck in LMR's payments for asbestos claims" and a "large number of policyholder specific arbitrations," Century initiated arbitration against the LMR in order to obtain a "global resolution of this dispute." Mem. of Law. in Opp'n to Pet. at 5.

Eight separate arbitration panels were formed.[3] Since each panel would be addressing nearly identical issues and contractual terms, one panel, known as the "Hunter Panel," held an evidentiary hearing and invited the other panels to attend and participate. The arbitration panel which issued the award contested here, known as the "Powers Panel" (hereinafter "Powers Panel" or "Panel"), attended the proceedings but reserved the right to hold future hearings and issue its own award.

The Hunter Panel divided the arbitration proceeding into three phases. Phase 1A, the outcome of which is at issue here, addressed Century's claims for declaratory relief and allegations concerning a breach of contract arising out of the RDRs. O'Donnell Cert. ¶ 14. The parties engaged in discovery and submitted memoranda of law on these issues, and an evidentiary

---

of Pet. at 1 n. 1 (quoting Robert W. Strain, ed., *Reinsurance Contract Wording* 766 (1992)).

**2.** In Treaties covering other years, a Reports and Remittances clause mandated that within 21 days of the close of each month, Century would forward to LMRs a "report of premiums," and a current account statement "summarizing premiums, claims paid and salvages recovered." The balance under the account

statement was due to be paid within 75 days of the end of that month. Ex. A to Mem. of Law in Opp'n to Pet. at Art. IX.

**3.** For background on the procedural history of this arbitration and an explanation as to why eight separate panels were formed, see *Certain Underwriters at Lloyd's v. Century Indemnity Co.*, Nos. 05–2809, *et seq.*, 2005 WL 1941652, 2005 U.S. Dist. LEXIS 16675 (E.D.P.A. Aug. 1, 2005).

hearing was held in October 2006. *Id.* ¶ 21.

On December 10, 2006, the Powers Panel issued an Interim Order, over the protestations of a dissent,[4] which adapted the relief granted by the Hunter Panel on October 24, 2006. *Id.* ¶ 26; Ex. 14 to O'Donnell Cert. Specifically, the Powers Panel ordered:

> "Within 106 days of the delivery of a billing ... LMRs must pay the entire amount billed or the undisputed portion plus 75 percent of the disputed portion, and present their written objections, if any, to full or partial payment, providing reasonable detail for the grounds for their objections."

Ex. 13 to O'Donnell Cert. ¶ 5.

In a footnote, the Powers Panel addressed their choice of 106 days:

> "While the contract at issue does not contain a 'Reports and Remittances' clause as do many of the other agreements between the parties, a majority of the Panel is of the opinion that this provision effectuates the general purpose of the agreement of the parties."[5]

*Id.* n. 1.

The Powers Panel noted that nothing in its protocol precluded LMRs from raising "any objection prior or subsequent to payment of disputed amounts relating to any particular account, loss notice or billing prior or subsequent to billing." Ex. 13 to

O'Donnell Cert. ¶ 7. In fact, the Panel retained jurisdiction in order to resolve any such disputes going forward. The Panel offered that, in general, it would "endeavor to decide any dispute referred to it pursuant [to the prepayment protocol] within a period of three months" and that the "prevailing party is likely to be awarded interest at a commercial rate on whatever sum is payable and in whichever direction." *Id.* at 9.

The Panel was never asked to resolve a dispute involving the prepayment provision. Indeed, the provision itself "has never been triggered." O'Donnell Cert. ¶ 29. On May 10, 2010, approximately three-and-one-half years following the issuance of the Interim Order, one of the arbitrators emailed counsel for LMR and Century and, noting that "none of the parties have needed guidance from the Panel in a considerable time," asked whether "it is necessary or appropriate for the Panel to continue further jurisdiction in this matter." Ex. 15 to O'Donnell Cert. The Panel requested the parties' views by June 1, 2010.

On June 1, 2010, LMCs submitted a letter in which they agreed that jurisdiction should be terminated, but requested that the Panel eliminate the provision requiring prepayment of 75% of disputed claims. LMCs argued that "[c]onverting such an interim provision into a permanent one, when it is no longer necessary to

---

4. James Powers, the LMR-appointed arbitrator, disagreed both with the Panel's grant of declaratory relief, which he did not believe was within the Panel's authority, and the specific prepayment protocol, which in his view rewrote the contract. Ex. 13 to O'Donnell Cert.

5. The Powers Panel's grant of 106 days to make payment was the same amount of time mandated by the Hunter Panel, which evaluated a Treaty that included the aforementioned Reports and Remittances clause. *See*

*supra* n. 2. The Hunter Panel stated that the "period of 106 days is based on Article IX of the contract which envisages a monthly settlement in account and payment 75 days after the close of the month." Ex. 14 to O'Donnell Cert. n. 1. The Hunter Panel noted that while "premium is no longer being reported and no monthly accounts as envisaged by this article are being rendered," the "period of 106 days gives LMRs the benefit of a full month of 31 days together with the 75 days after the close of the month for payment." *Id.*

encourage the parties' resumption of good faith relations, will improperly impose upon the parties rights and obligations that are simply not contemplated by the terms of the reinsurance contract." Ex. 16 to O'Donnell Cert. On that same date, Century submitted a letter proposing that the Panel enter a Final Order which would terminate jurisdiction over the matter but "otherwise finaliz[e] the December 10, 2006 Phase 1A Order and Protocol, with one caveat that the Protocol shall be amended at Paragraph 8 to take account of the fact that this Panel will no longer have further jurisdiction over future disputes, so that the parties will have to pursue arbitration before a new panel with respect to any future disputes under the Protocol." Ex. 17 to O'Donnell Cert. Century noted that Lloyd's, another LMR subject to the order of the Powers Panel, did not object to its request. Century also stated that it intended to respond substantively to LMCs' submission. The response was submitted on June 8, 2010, and LMCs replied on June 15, 2010.

The arbitrators reviewed the matter, and on July 15, 2010, issued a Final Order denying the relief requested by the LMCs. The Final Order terminated jurisdiction and incorporated the Interim Order, modi-

fied only to reflect that since the Panel no longer had jurisdiction, either party could initiate arbitration within ten days of a failure to agree on payments. On October 14, 2010, LMCs brought this petition seeking to vacate the Panel's Final Order.

## DISCUSSION

### A. *Choice of Law and Statute of Limitations*

The parties dispute whether New York's Civil Practice Law ("CPLR") or the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ("FAA"), should apply to this petition. This question has potentially significant consequences, because if the CPLR applies, the petition is likely time-barred.[6] Century's contention that the CPLR should apply has considerable merit. It is hard to imagine what the parties intended when they agreed that the "arbitration law of New York State shall govern such arbitration" if they did not intend to have the CPLR apply to petitions to review arbitration awards. Furthermore, the cases cited by petitioners to support their claim that the FAA should apply are inapposite and, if anything, appear to support Century's position.[7]

---

**6.** The petition was filed ninety-one days after the issuance of the Final Order. The statute of limitations for petitions to vacate arbitration awards under the CPLR is ninety days.

Petitioners argue that even under the CPLR, the petition is timely for either of two reasons. First, the statute of limitations only begins to run upon "delivery" of a final award. According to petitioners, the Final Order was never properly "affirmed" or "delivered" as required by the CPLR, and therefore the statute of limitations has not run. Second, even if the petition was initially late, petitioners claim that they are now timely petitioning to vacate in response to Century's counter-petition, as permitted under New York Law. Century challenges both of these contentions. *See* Reply Mem. of Law in Supp. of Cross–Pet. at 3–6. As we conclude

that petitioners have not met their substantive burden for demonstrating that the arbitration award should be vacated in any event, we do not address these arguments.

**7.** Petitioners cite two cases from this court for the premise that New York arbitration law only applies to post-award actions for confirmation or vacatur when the contract containing the arbitration clause specifically states that New York law governs the contract's *"enforcement."* Reply Mem. of Law in Supp. of Pet. at 2 (emphasis in original). However, in those cases the court evaluated contracts which merely contained a general choice-of-law provision stating that the contract and performance under it shall be governed by New York law. *See CRC Inc. v. Computer Sciences Corp.*, No. 10 Civ. 4981(HB), 2010

However, we ultimately conclude that regardless of the governing law or whether the petition should be dismissed on equitable or limitations grounds,[8] LMCs have not met their substantive burden for demonstrating that the arbitrators acted outside the scope of their authority. Therefore, we do not address the myriad choice-of-law and procedural matters raised by the parties and simply hold that, assuming the petition has been properly brought to this Court, it is insufficient to warrant vacatur.

## B. *Legal Standard*

 It is well-settled that arbitration awards are "subject to very limited re-

view in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*, 103 F.3d 9, 12 (2d Cir. 1997) (internal quotes omitted); *Barbier v. Shearson Lehman Hutton Inc.*, 948 F.2d 117, 120 (2d Cir.1991). Arbitration awards are not reviewed for errors made in law or fact. *See Willemijn Houdstermaatschappij*, 103 F.3d at 12. Rather, an award may only be vacated on extremely limited grounds. In this case, petitioners seek to vacate the award pursuant to 9 U.S.C. § 10(a)(4),[9] which provides for va-

WL 4058152, 2010 U.S. Dist. LEXIS 109562 (Oct. 14, 2010); *Penrod Mgmt. Grp. v. Stewart's Mobile Concepts, Ltd.*, No. 07 Civ. 10649(JGK), 2008 WL 463720, 2008 U.S. Dist. LEXIS 11793 (S.D.N.Y. Feb. 19, 2008). The contracts were silent as to what law should govern any arbitration. Under those circumstances, in the "absence of more critical language concerning enforcement," the court held that the FAA should apply. *Penrod*, 2008 WL 463720 at *2, 2008 U.S. Dist. LEXIS 11793 at *5 (Feb. 19, 2008) (quoting *Diamond Waterproofing Sys., Inc. v. 55 Liberty Owners Corp.*, 4 N.Y.3d 247, 253, 793 N.Y.S.2d 831, 826 N.E.2d 802, 806 (2005)).

In this case, it is the arbitration clause itself which provides that New York law should apply. Presumably, this is the "critical language concerning enforcement" that was lacking in *CRC Inc.* and *Penrod*. Petitioners ignore the obvious distinction between those cases and the one presently before this Court. Furthermore, they provide no explanation as to the import of the arbitration clause's provision requiring the application of New York law if it does not concern petitions such as this.

8. Century contends that even under the FAA, the petition to vacate should be dismissed either as time-barred, using the 2006 Interim Order as the date on which the statute of limitations began to run, or under principles of waiver or estoppel, since the LMCs sat on their hands following the issuance of the Interim Order rather than asking for it to be made final in order to have it reviewed by a

Court. We do not substantively evaluate these issues, as we determine that petitioners have not met their burden for overturning an arbitration award in any event.

9. This petition was brought pursuant to 9 U.S.C. § 10(a)(4). However, the parties agree that inasmuch as federal law applies, the petition is governed by Chapter 2 of the FAA, 9 U.S.C. §§ 201–208, which provides for the enforcement of the Convention on Foreign Arbitral Awards. This is because the award "arises out of a commercial relationship not entirely between citizens of the United States." Mem. of Law in Opp'n to Pet. at 13 n. 15. The parties agree that this should not alter our analysis, and we therefore reference case law developed in the context of § 10(a)(4). *See, e.g., Parsons & Whittemore Overseas Co. v. Societe Generale de L'Industrie du Papier*, 508 F.2d 969, 976 (2d Cir.1974) (noting that the Convention on Foreign Arbitral Awards "tracks in more detailed form [the FAA]" and that "[b]oth provisions basically allow a party to attack an award predicated upon arbitration of a subject matter not within the agreement to submit to arbitration"). Likewise, neither party suggests that the application of the CPLR would materially alter our substantive standard of review. *See* N.Y. C.P.L.R § 7511(b)(1)(iii) ("The award shall be vacated on the application of a party ... if the court finds that the rights of that party were prejudiced by ... an arbitrator, or agency or person making the award exceed[ing] his power or so imperfectly executing] it that a final and definite award

catur where "the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."

■ The Second Circuit has "consistently accorded the narrowest of readings to the FAA's authorization to vacate awards pursuant to § 10(a)(4)." *Banco de Seguros del Estado v. Mut. Marine Office, Inc.*, 344 F.3d 255, 262 (2d Cir.2003) (internal quotation omitted). The inquiry "focuses on whether the arbitrators had the power based on the parties' submissions or the arbitration agreement, to reach a certain issue, not whether the arbitrators correctly decided that issue." *Westerbeke Corp. v. Daihatsu Motor Co., Ltd.*, 304 F.3d 200, 220 (2d Cir.2002) (citation omitted). A reviewing court merely determines " 'whether the arbitrator's award draws its essence' from the agreement to arbitrate, 'since the arbitrator is not free merely to dispense his own brand of industrial justice.' " *ReliaStar Life Ins. Co. v. EMC Nat'l Life Co.*, 564 F.3d 81, 85 (2d Cir.2009) (alterations in original) (quoting *187 Concourse Assocs. v. Fishman*, 399 F.3d 524, 527 (2d Cir.2005)).

■ "Where an arbitration clause is broad, as here, arbitrators have the discretion to order remedies they determine appropriate, so long as they do not exceed the power granted to them by the contract itself." *Banco de Seguros*, 344 F.3d at 262. Vacatur of an award is " 'appropriate only if the arbitral award contradicts an express and unambiguous term of the contract [between the parties] or if the award so far departs from the terms of the agree-

ment that it is not even arguably derived from the contract.' " *ReliaStar Life Ins. Co.*, 564 F.3d at 90 (Pooler, J., dissenting) (quoting *Westerbeke Corp.*, 304 F.3d at 222). Arbitration awards will be upheld so long as the arbitrator "offers a barely colorable justification for the outcome reached." *Banco de Seguros*, 344 F.3d at 260 (internal quotation omitted).

### C. *LMCs' Petition to Vacate*

■ LMCs raise two arguments in support of their petition. First, they contend that the Panel exceeded its powers by materially altering the Agreement to include a prepayment provision. Since an "arbitrator cannot re-write a new agreement for the parties," *Collins & Aikman Floor Coverings Corp. v. Froehlich*, 736 F.Supp. 480, 484 (S.D.N.Y.1990), petitioners argue that the award should be vacated. Second, LMCs contend that the Panel ordered relief that neither party requested, and therefore it did not rule on an issue "the parties agreed to submit ... for arbitration." Mem. of Law in Supp. of Pet. at 19 (quoting *Banco de Seguros*, 344 F.3d at 262). We address petitioners' arguments in reverse order.

#### 1. *The Issue was Presented to the Arbitrators*

■ Petitioners acknowledge that Century "asked the Panel to decide 'how' and 'when' LMCs are required to indemnify Century for losses under Treaty 101." Reply Mem. of Law in Supp. of Pet. at 6. However, they complain that Century only sought an order requiring LMC to "pay or *deny*" bills within 75 days of receipt. Ac-

upon the subject matter submitted was not made ...."); *see also Silverman v. Benmor Coats, Inc.*, 61 N.Y.2d 299, 308, 473 N.Y.S.2d 774, 461 N.E.2d 1261 (1984) (arbitrator's award "will not be vacated even though the court concludes that his interpretation of the

agreement misconstrues or disregards its plain meaning or misapplies substantive rules of law, unless it is violative of a strong public policy, or is totally irrational, or exceeds a specifically enumerated limitation on his power").

cording to petitioners, by awarding relief that was not specifically requested (the prepayment provision), the arbitrators deprived LMCs of due process since they were unable to put on witnesses or evidence relating to this issue.

For purposes of this decision, we will accept petitioners' claim that we should disregard the fact that the Panel was clearly presented with the issue of whether to finalize its Interim Order,[10] that Century explicitly requested such relief from the Panel, and that it is the Final Order which petitioners challenge in this Court.[11] Nevertheless, petitioners' argument is unavailing. Petitioners conflate the question of whether an *issue* was presented to the arbitrators with the question of whether a *potential remedy* was presented to the arbitrators. It is indisputable that arbitrators have no authority to rule on an issue not submitted to them. However, there is no parallel *per se* rule that it is beyond the authority of the arbitrators to issue a remedy directed to an issue squarely before them unless it was requested by one of the parties. The case law presented by petitioners only supports the former, uncon-

tested, rule of law. *See, e.g., First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) (arbitration is "a way to resolve those disputes-but only those disputes-that the parties have agreed to submit to arbitration"); *Totem Marine Tug & Barge, Inc. v. North Am. Towing, Inc.*, 607 F.2d 649, 651 (5th Cir.1979) (vacating award granting damages for "charter hire" when the party who brought the arbitration conceded in brief to arbitration panel that "charter hire was not an issue in the arbitration").

LMCs' position essentially asks us to create such a rule and find that the arbitrators necessarily exceeded the scope of their authority by fashioning relief not specifically requested, even though the relief was ordered to remedy an issue they concede was submitted to the Panel. Such a holding is fundamentally at odds with the role of the courts in reviewing arbitration awards. As detailed above, a reviewing court simply asks whether the award "draws its essence from the agreement to arbitrate" or has a "barely colorable justification." *Banco de Seguros*, 344 F.3d at 260 (internal quotation omitted).[12]

**10.** Petitioners argue that the letters submitted in support of the parties' respective positions regarding the conversion of the Interim Order into a Final Order cannot qualify as an issue submitted to the Panel because it merely gave Century's "stamp of approval to the 75% payment provision *after* the hearing." Reply Mem. of Law in Supp. of Pet. at 7 (emphasis in original). They claim that the letters "did not submit the issue to the Panel at a time that would have permitted LMCs to mount a defense, put on witnesses, and receive a fair hearing," and that "LMCs were thus prejudiced." *Id.*

**11.** This raises an interesting tension in petitioners' position. In order to defend against Century's claims that their petition is untimely or otherwise barred by principles of waiver or estoppel, petitioners stress that the Interim Order was largely meaningless and that there was no contestable issue until the Final Or-

der. However, in order to support their claim that the arbitrators ruled on an issue not submitted to them, they focus their argument on the hearing and submissions leading up to the Interim Order, and ask us to entirely ignore the Final Order.

**12.** In addition, this argument ignores the reality of judicial and arbitral decisionmaking. As we noted at oral argument, judges are not limited to resolving disputes by simply choosing between two options presented by the parties. Rather, we are often required to use our judgment and to craft a different remedy. For example, a party might seek an injunction and provide specific terms to the court. The court, however, may decide to delete, amend, or add terms before issuing an order. *See* Tr. of Oral Argument at 3. Arbitrators generally have broader discretion in ruling on an issue submitted to them, since they are usually relieved of the procedural and substantive stric-

Furthermore, while there could be a factual context in which arbitrators exceed the scope of their powers by granting relief not specifically requested by a party, this is not such a case. As noted above, the arbitration clause explicitly directed the arbitrators to interpret the contract "as an honorable engagement" and to "make their award with a view to effecting the general purpose of this Agreement in a reasonable manner, rather than in accordance with a literal interpretation of the language." Ex. A to O'Donnell Cert. at Art. IX. It is axiomatic that arbitration is a "creature of contract." *See, e.g., Baker & Taylor, Inc. v. AlphaCraze.com Corp.,* 602 F.3d 486, 490 (2d Cir.2010) (internal quotation omitted). Having agreed that the arbitrators should resolve disputes in such a manner, petitioners cannot now complain that the arbitrators granted relief that was not specifically requested by either party.

Lastly, petitioners' complaint that they were not able to present any evidence or witnesses relating to the question of prepayments is belied by the record before the Court. The parties clearly detailed their long course of dealing to the Panel. This included presenting evidence of the parties' prior practice of Outstanding Cash Advances (OCAs), in which LMRs would make prepayments into a trust from which Century would then withdraw the amount to which it was entitled. *See* Ex. 10 to O'Donnell Cert. at 14–16. In their memoranda to this Court, LMCs contend that the OCAs were entirely voluntary and noncontractual. LMCs describe the evidence pertaining to OCAs that was presented to the Panel, and argue that it "establish[ed] the converse of the point Century seeks to make: [it proved] that LMCs had no intent or contractual obligation, express or implied, to pay Century for losses LMCs deny." Reply Mem. of Law in Supp. of

Pet. at 8–9. This argument discredits their claim that they were prejudiced by not having the opportunity to put on evidence or witnesses relating to prepayments or the parties' course of dealing. Clearly, the Panel was presented with evidence that the parties had successfully used a prepayment method in the past.

### 2. *The Prepayment Provision is Within The Authority of the Panel*

■ We further conclude that the arbitrators did not exceed the scope of their authority by fashioning the relief at issue. While we are sympathetic to LMCs' concerns that the Final Order includes obligations not explicitly bargained for by the parties, we do not believe that the arbitrators materially rewrote the contract or acted outside the scope of their authority. Once again, we note that this contract had an honorable engagement clause, which specifically directed the arbitrators not to interpret the contract literally, but to effect the "general purpose ... in a reasonable manner." As the Second Circuit has noted, "[c]ourts have read [honorable engagement] clauses generously, consistently finding that arbitrators have wide discretion to order remedies they deem appropriate." *Banco de Seguros del Estado v. Mut. Marine Office, Inc.,* 344 F.3d 255, 261 (2d Cir.2003). Furthermore, it is plainly obvious that the contract, although it did not include a Reports and Remittances clause, expected a prompt flow of funds between the LMRs and Century to cover claims in which the Agreement was "involved." The Panel ultimately concluded that its protocol best effectuated the parties' purpose. We cannot conclude that it did not have, at a minimum, a barely colorable justification for its decision.

tures placed upon courts by legislative enact-

ments and binding precedent. *See Id.*

Petitioners rely primarily on a case from the Eastern District of Pennsylvania, affirmed by the Third Circuit, in which that court was faced with an honorable engagement clause similar to the one in the Agreement between LMCs and Century. *See PMA Capital Ins. Co. v. Platinum Underwriters Berm., Ltd.*, 659 F.Supp.2d 631, 636 (E.D.Pa.2009), *aff'd* 400 Fed.Appx. 654 (3d Cir.2010). In that case, an arbitration panel was asked to resolve a dispute between an insured and reinsured regarding the validity and scope of a Deficit Carry Forward Provision in the parties' contract. The provision allowed the reinsurer to "carry forward any loss it may have incurred in one year to the next year, when the reinsurer can apply funds from that year's experience account [13] (assuming it has a positive balance) to offset the first year loss." *Id.* at 633. The parties disputed whether a reinsurer. Platinum, was able to carry forward losses from 1999–2001, given that it was not a party to the agreement covering those years. They also disagreed as to how to calculate another reinsurer's deficit under the 1999–2001 contract. The arbitration panel received evidence and heard testimony regarding these two issues. It then issued a one page award which, "in its entirety," provided that: "(1) PMA is to pay Platinum $6,000,000.00 within 30 days of the date of this award; (2) upon such payment, any and all references to a deficit carry forward in the [2003 Agreement will be] removed from the contract; and (3) [a]ll other requests for relief by both parties are denied." *Id.* (alterations in original) (internal quotations omitted). The panel

"offered no reasoning or explanation for its decision." *Id.*

In reviewing the award, the court first cited the passage from the Second Circuit referenced above, which noted that "[c]ourts have read [honorable engagement] clauses generously, consistently finding that arbitrators have wide discretion to order remedies they deem appropriate." *Id.* at 636 (alterations in original) (quoting *Banco de Seguros*, 344 F.3d at 261). Nevertheless, the court found that even "broad discretion has limits" and that no court "has held that such a clause gives arbitrators authority to re-write the contract they are charged with interpreting." *PMA Capital*, 659 F.Supp.2d at 636. The court then determined that the arbitrators "evidently found the Deficit Carry Forward Provision to be more trouble than it was worth and simply eliminated it from the 2003 Agreement." *Id.* However, in an "apparent effort to 'compensate' Platinum for this loss, the Arbitrators also allowed Platinum to 'carry forward' one last deficit" of $6,000,000, even though both parties agreed that the contractual preconditions for such payment had not yet been met. *Id.* In the court's view, these actions went well beyond the discretion permitted by the honorable engagement clause. Since the "'contract itself requires the enforcement of the Deficit Carry Forward Provision, not its elimination,'" the arbitrators clearly "exceeded their authority under the Honorable Engagement Clause" by ordering an illegitimate payment of $6,000,000 pursuant to such provision before eliminating it entirely. *Id.* The Third Circuit agreed. *PMA Capital v. Platinum Un-*

13. The "experience account" was an "interest-bearing account controlled by the reinsurer" into which the "reinsured ... deposits funds." *PMA Capital*, 659 F.Supp.2d at 632. "As claims come due against the reinsured, they are paid first from this 'experience account.' If the claims exceed the account, the reinsurer is obligated to pay that excess amount." Finally, at the "contract's conclusion, the reinsurer pays a 'profit commission,' returning to the reinsured the funds (if any) remaining in the experience account." *Id.* at 633.

*derwriters Bermuda, Ltd.,* 400 Fed.Appx. 654 (3d Cir.2010).

The case before us is distinguishable from *PMA Capital.* First, the Panel's prepayment mechanism does not violate any explicit provision of the contract itself. LMCs suggest that the prepayment provision requires them to make payments for claims not covered by their underlying policy, and therefore materially alters the terms of the parties' contract. This is not accurate. The protocol simply requires that the LMCs will "front" 75% of the money while disputed payments are resolved. If it turns out that the policy is not "involved," LMCs will recoup their money with interest.

Furthermore, as noted above, the prepayment protocol is a legitimate interpretation of the contract's implied expectation that claims would be paid promptly. Rather than ordering relief that explicitly violates the contract, the Panel's protocol effectuates the contract's purpose in a reasonable manner. Even if this Court disagreed with the Panel's determination, we have no authority to override their considered judgment.

Lastly, unlike *PMA Capital,* the Powers Panel clearly explained their rationale and justification for the award, which it believes "effectuates the general purpose of the agreement of the parties." Ex. 13 to O'Donnell Cert. n. 1.

We close by noting a few issues with petitioners' various arguments to this Court, both in their written submissions and at oral argument. First, petitioners essentially assert that, once the arbitrators determined that they were violating the Agreement by imposing the RDRs, it was inappropriate for the Panel to issue any remedy beyond what Century asked for or simply a return to the status quo ante. As we stated at oral argument, the "notion that the reinsurers could themselves change the nature of the contract by requiring [the RDRs] and then think, when they are called to task for that, that the answer of the arbitrators is limited to either exactly the thought that Century had or sort of a status quo ante is ... wrong." Tr. of Oral Argument at 4. "[T]o think you can [impose your own new terms] and not suffer consequences is ... legally naive." *Id.* Having improperly imposed their own terms into the contract, LMCs cannot reasonably complain that the arbitrators, with the mandate of an honorable engagement clause, constructed a remedy in an effort to even the balance of power and ensure that the contract will be performed properly going forward.

Furthermore, the protocol issued by the arbitrators provided two significant protections for LMCs. First, it offered that the arbitrators will "endeavor to decide any dispute referred to it pursuant [to the prepayment protocol] within three months." Ex. 13 to O'Donnell Cert. ¶ 7. Second, it stated that the "prevailing party is likely to be awarded interest at a commercial rate on whatever sum is payable and in whichever direction." *Id.* LMCs' attempt to portray the protocol as a great injustice which will allow Century to abuse the parties' relationship and use them as an "ATM" is contrary to logic. In reality, it is hard to imagine what incentive Century could have to submit faulty claims only to owe interest to the LMCs on any unnecessarily advanced amount.

At oral argument, petitioners claimed that these protections would not necessarily be enforced by future arbitration panels, given that the panel which provided them no longer exists, and that arbitrators typically do not have to follow previous orders as binding. There are a couple of responses to this concern. First, even if a future panel is not obligated by law or contract to

enforce the Powers Panel's offer to award interest and to endeavor to reach a decision within three months,[14] one would think that, barring some exceptional circumstance, a future panel would respect a previous panel's decision. This is particularly so given that the Powers Panel's award has now been confirmed by a federal court.

Second, as we noted at oral argument, if petitioners were truly concerned about whether a future panel would enforce these protections, and this is not simply an argument crafted to serve their purposes in this litigation, then they could have asked the Powers Panel to retain jurisdiction. LMCs could have evaluated their options and determined that rather than seeking to terminate the Panel's jurisdiction and eliminate the prepayment provision, they should accept the prepayment provisions coupled with the protections embodied in the Powers Panel's award. Having made the former choice and asked the Panel to terminate jurisdiction, they cannot complain about the fact that the Powers Panel no longer exists and that its

protections might not be honored by a future panel.

Lastly, petitioners raised a concern at oral argument that since this case is a matter of public record, our decision will be widely read throughout the industry and will "guide both arbitrators and practitioners regarding the scope of the jurisdiction [a] panel has." Tr. of Oral Argument at 16. Petitioners' implication is that our ruling endorses a dangerous expansion of power for arbitral panels, and arbitrators and companies throughout the industry will be aware of the Powers Panel's protocol and its approval by a federal court. Once again, we remind petitioners that it was their choice to pursue this matter in federal court. Just as they could have chosen to accept the prepayment provision and ask the Powers Panel to retain jurisdiction in order to ensure the protections of interest and a speedy resolution, they similarly could have chosen to accept the Final Order of the Powers Panel rather than bring this case in federal court, where it would become a matter of public record.[15]

---

14. We note that both the award of interest and the attempt to resolve the dispute within three months are part of the Final Order. Those protections were included in paragraph nine of the Interim Order, and the Final Order only modified paragraph eight. However, it is true that paragraph nine of the Interim Order states that, in general, "the *Panel* will endeavor to decide any dispute … within a period of three months." Ex. 13 to O'Donnell Cert. at ¶ 9 (emphasis added). As LMCs pointed out at oral argument, the "Panel" is a defined term which specifically refers to the Powers Panel. Therefore, it is possible that no future panel would feel obligated to "endeavor" to resolve the dispute within three months. We are not certain the same argument could apply to the award of interest, for which the Interim Order states that the "prevailing party is likely to be awarded interest at a commercial rate on whatever sum is payable and in whichever direction." *Id.*

15. We note that petitioners believed that they would be able to bring this case under seal and entirely outside of the public's eye. While we ultimately allowed the parties to redact their publicly-filed submissions, we rejected their attempt to use the court system in a private manner. In recent years, judges in this Court have become more sensitive to these issues. *See, e.g., Standard Chartered Bank Int'l (Americas) v. Calvo,* 757 F.Supp.2d 258 (S.D.N.Y.2010) (opinion by Part I Judge rejecting attempt to file action to enjoin arbitration under seal); *Century Indem. Co. v. Certain Underwriters at Lloyd's, et al.,* No. 11 Civ. 1034(NRB) (Part I Judge rejecting attempt to file petition to confirm arbitration award under seal). It is worth noting, however, that petitioners opted to continue with this case even after we made it clear that the record would not remain sealed.

D. *Century's Cross–Petition*

Since we deny the petition to vacate. Century's cross-petition to confirm the arbitration award is granted, regardless of what substantive law applies to this petition. *See* N.Y. C.P.L.R. § 7511(e)[16] ("[U]pon the denial of a motion to vacate or modify, [a court] shall confirm the award."); *see also Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 587, 128 S.Ct. 1396, 170 L.Ed.2d 254 (2008) ("On application for an order confirming the arbitration award, the court 'must grant' the order 'unless the award is vacated, modified, or corrected as prescribed [by the FAA]' ... There is nothing malleable about 'must grant,' which unequivocally tells courts to grant confirmation in all cases, except when one of the 'prescribed' exceptions applies.") (quoting 9 U.S.C. § 9).

## CONCLUSION

For the aforementioned reasons, the petition to vacate is denied. Respondent's cross-petition to confirm is granted. The Clerk of the Court is hereby directed to close this case forthwith.

**SO ORDERED.**

16. In light of the fact that petitioners clearly had actual notice of the Final Order, and regarded it as sufficient to permit the commencement of a petition to vacate, we view the argument that the award was never properly affirmed pursuant to the CPLR and thus cannot be confirmed as hyper-technical and nondispositive.