# United States Court of Appeals
## For the First Circuit

---

No. 14-1644

FIRST STATE INSURANCE COMPANY and
NEW ENGLAND REINSURANCE CORPORATION,

Appellees,

v.

NATIONAL CASUALTY COMPANY,

Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

---

Before

Selya, Circuit Judge,
Souter,[*] Associate Justice,
and Lipez, Circuit Judge.

---

Kendall W. Harrison, with whom Godfrey & Kahn, S.C., Susan A. Hartnett, Patrick J. Hannon, and Sugarman, Rogers, Barshak & Cohen, P.C. were on brief, for appellant.
Lloyd A. Gura, with whom Michael P. Mullins, David W.S. Lieberman, Day Pitney LLP, Amy J. Kallal, Matthew J. Lasky, and Mound Cotton Wollan & Greengrass were on brief, for appellees.

---

March 20, 2015

---

[*]Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**SELYA, Circuit Judge.** A party that implores a court to vacate an arbitration award normally faces a steep uphill climb: the scope of judicial review of arbitration awards is "among the narrowest known in the law." Me. Cent. R.R. Co. v. Bhd. of Maint. of Way Emps., 873 F.2d 425, 428 (1st Cir. 1989). And where, as here, the arbitration clause contains an "honorable engagement" provision, judicial review is encumbered by yet a further level of circumscription. Surveying this arid landscape, the court below refused to vacate the challenged arbitration award and instead confirmed it. Discerning no error, we affirm.

## I. BACKGROUND

In industry parlance, a primary insurer may cede risk to another insurer, who effectively becomes a reinsurer. See N. River Ins. Co. v. ACE Am. Reins. Co., 361 F.3d 134, 137 (2d Cir. 2004). When a reinsurer cedes assumed risk to yet another insurer, that transfer is called a retrocessional agreement. See Compagnie de Reassurance d'Ile de France v. New Eng. Reins. Corp., 57 F.3d 56, 62 (1st Cir. 1995). Here, First State Insurance Company and New England Reinsurance Corporation (collectively, First State) entered into a number of reinsurance and retrocessional agreements with a reinsurer, National Casualty Company (National). In August of 2011, First State demanded arbitration under eight of these agreements to resolve differences of opinion about billing disputes and the interpretation of certain contract provisions relating to

-2-

payment of claims.[1]   By agreement of the parties, all the arbitrations were consolidated in a single proceeding before a panel of three arbitrators.

At First State's suggestion and over National's objection, the arbitrators agreed to consider the contract interpretation issues first.  As to those issues, First State sought declaratory relief addressing (i) the minimum quantum of information required to be furnished in order to trigger National's payment obligations and (ii) whether National could condition payment on its exercise of its contractual right to inspect First State's files.

After briefing and argument, the arbitrators handed down a contract interpretation award dated December 13, 2012.  This award established a payment protocol under the agreements, which provided that National's payment obligations were to be triggered "upon its receipt of a billing supported by a Proof of Loss and Reinsurance Report(s) prepared by First State in a form and content generally as those introduced with the briefings on this motion." The award further noted that "[s]aid payments may be made subject to an appropriate reservation of rights by [National] in instances

---

[1] The arbitration clauses in the various agreements are similar but not identical.  The same holds true for the loss settlement provisions and the provisions granting National a right to inspect or audit First State's books and records at any reasonable time.  These modest  differences are not material to this appeal.

where it has or does identify specific facts which create a reasonable question regarding coverage under the subject reinsurance agreement(s)" but "[p]ayment obligations on the part of [National] are not conditioned upon the exercise of its right to audit or the production of additional information or documents, other than those provided by First State as described . . . above."

First State promptly repaired to the United States District Court for the Southern District of New York and filed a petition pursuant to the Federal Arbitration Act (FAA), 9 U.S.C. § 9, to confirm the award. National moved to dismiss the petition or, in the alternative, to transfer venue to the District of Massachusetts. On September 27, 2013 — some eight months after suit had been brought — the court transferred the case to the District of Massachusetts. National thereafter cross-petitioned to vacate the contract interpretation award. See id. § 10(a)(4). That cross-petition was not filed until October 15, 2013.

By then, the underlying arbitration proceedings had run their course, and First State had petitioned in the District of Massachusetts to confirm the panel's final award. The district court consolidated the two confirmation petitions and, after a hearing, summarily confirmed both the contract interpretation award and the final arbitration award. This timely appeal ensued.

-4-

## II.  ANALYSIS

National's claims of error relate only to the contract interpretation award.  Before reaching them, however, we must take the measure of a preliminary obstacle.  Under the FAA, a party seeking to vacate an arbitration award must apply to the district court within 90 days after the promulgation of the award.  See id. § 12.  First State asserts that National's cross-petition to vacate the contract interpretation award was filed outside this temporal window and is, therefore, time-barred.

It is clear beyond hope of contradiction that National did not meet the 90-day statutory deadline.  The arbitrators issued the contract interpretation award on December 13, 2012, and National did not file its petition to vacate that award until October 15, 2013 (more than 300 days later).  Spinning an intricate web of arguments, National insists that its motion to dismiss First State's petition to confirm (which was filed within the 90-day period) could serve as a surrogate for a petition to vacate or, at least, had the effect of tolling the deadline.  National adds a series of arguments based on First State's infelicitous choice of a forum, averring that it could not have filed a timeous petition to vacate in the Southern District of New York conditioned upon the disposition of its motion to dismiss without undermining its venue-based objections and unnecessarily taxing the resources of two district courts.

We need not unravel this tangled skein, however, as this case is easily resolved on the merits.[2]  See, e.g., Cozza v. Network Assocs., Inc., 362 F.3d 12, 15 (1st Cir. 2004) (bypassing "novel jurisdictional issue" regarding timeliness of appeal in FAA case where matter was susceptible to straightforward merits disposition); Nisselson v. Lernout, 469 F.3d 143, 151 (1st Cir. 2006) (bypassing unsettled prudential standing question when record provided clear basis to resolve case on the merits).  On this understanding, we proceed directly to the merits of National's appeal.

National asseverates that the district court erred in refusing to vacate the contract interpretation award because the arbitrators exceeded the scope of their authority.  Since the court below neither conducted an evidentiary hearing nor made findings of fact, our review is de novo.  See Cytyc Corp. v. DEKA Prods. Ltd. P'ship, 439 F.3d 27, 32 & n.2 (1st Cir. 2006).

A federal court's authority to defenestrate an arbitration award is extremely limited.  See Oxford Health Plans LLC v. Sutter, 133 S. Ct. 2064, 2068 (2013); Cytyc, 439 F.3d at 32.

---

[2] Although the Supreme Court has disapproved of some uses of hypothetical jurisdiction, see Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998), we have held that the Court's rationale extends only to situations that implicate Article III jurisdiction.  See, e.g., Nisselson v. Lernout, 469 F.3d 143, 151 (1st Cir. 2006); McBee v. Delica Co., 417 F.3d 107, 127 (1st Cir. 2005).  We may continue to bypass thorny jurisdictional issues and resolve cases on the merits where, as here, those jurisdictional issues implicate only statutory or prudential considerations.

Here, the sole inquiry is whether the arbitrators "even arguably" construed the underlying agreements and, thus, acted within the scope of their contractually delineated powers. Oxford Health, 133 S. Ct. at 2068. A legal error (even a serious one) in contract interpretation is, in and of itself, not a sufficient reason for a federal court to undo an arbitration award. See id.; Cytyc, 439 F.3d at 32. Only if the arbitrators acted so far outside the bounds of their authority that they can be said to have dispensed their "own brand of industrial justice" will a court vacate the award. Stolt-Nielsen v. AnimalFeeds Int'l Corp., 559 U.S. 662, 671 (2010) (internal quotation mark omitted). Put another way, as long as an arbitration award "draw[s] its essence" from the underlying agreement, it will withstand judicial review — and it does not matter how "good, bad, or ugly" the match between the contract and the terms of the award may be. Oxford Health, 133 S. Ct. at 2068, 2071 (internal quotation mark omitted).

National submits that this case represents one of the rare instances in which the vacation of an arbitration award is warranted because the arbitrators exceeded the scope of their powers by re-writing the terms of the parties' agreements. In its view, the payment protocol fashioned by the arbitrators is ultracrepidarian since it obligates National to pay billings that may not fall within the terms and conditions of any applicable agreement. National further submits that the award effectively

-7-

forecloses or at least significantly impairs its broad access rights under the inspection and audit provisions of the agreements by conditioning those rights on the transmittal of an appropriate time-of-payment reservation of rights. This reservation of rights procedure, National says, is plucked out of thin air and not derived from any contract term.

These arguments comprise more cry than wool. In ascertaining whether arbitrators arguably interpreted the underlying contract, an inquiring court must look first to the text of the arbitral award. After all, "[t]he award will often suggest on its face that the arbitrator was arguably interpreting the contract." BNSF Ry. Co. v. Alstom Transp., Inc., __ F.3d__, __ (5th Cir. 2015) [No. 13-11274, Slip Op. at 4].

The contract interpretation award here is of this genre: it explained that the payment protocol was, in part, "based upon the terms of the subject reinsurance agreements," and confined its inquiry into National's payment obligations to the obligations existing "under the subject reinsurance agreements." It is readily apparent, then, that the arbitrators understood the nature of their task. See Oxford Health, 133 S. Ct. at 2069; BNSF, __ F.3d at __ [Slip Op. at 4].

To cinch the matter, the payment protocol limned in the award tracks the plain language of the relevant provisions in the parties' reinsurance agreements. By way of illustration, the

-8-

various loss settlement provisions, see supra note 1, obligate National to pay either "within 15 days" or "at the same time . . . as the reinsured may elect to pay" or "immediate[ly]" upon the production of "reasonable" or "satisfactory" evidence of the amount "due" or "to be paid."  These arrangements are generally consistent with the payment protocol in the arbitration award, which obligates National to pay "upon its receipt of a billing" supported by a proof of loss and reinsurance report containing, inter alia, the amount paid or due by First State to its insured.

We think it noteworthy that none of the loss settlement provisions in the underlying agreements expressly cross-references the separate inspection, audit, or access to records provisions. The contract interpretation award mirrors this separation; it provides that National's payment obligations are independent of and not conditioned upon the exercise of National's right to inspect and audit First State's records. Given this structural similarity, we are fortified in our conclusion that the arbitrators were doing nothing beyond construing the underlying agreements.

Let us be perfectly clear.  Whether the arbitrators were correct either in their interpretation of the underlying agreements or in their implementation of a particular payment protocol is not within our purview.  For present purposes, it suffices that, when compared to the text of the underlying agreements, the contract

interpretation award leaves no doubt that the arbitrators were arguably construing those agreements.

This brings us to National's complaint that the reservation of rights procedure adumbrated in the contract interpretation award does not draw its essence from the underlying agreements. That procedure, National says, operates to circumscribe its broad inspection and audit rights under those agreements. We do not agree.

Each of the eight reinsurance agreements, as well as the agreement to consolidate the arbitrations, contains an honorable engagement provision. This language directs the arbitrators to consider each agreement as "an honorable engagement rather than merely a legal obligation" and goes on to explain that the arbitrators are "relieved of all judicial formalities and may abstain from following the strict rules of law."

Until today, this court has not had occasion to address the operation and effect of an honorable engagement provision in an arbitration clause. We believe that an honorable engagement provision empowers arbitrators to grant forms of relief, such as equitable remedies, not explicitly mentioned in the underlying agreement. See Banco de Seguros del Estado v. Mut. Marine Office, Inc., 344 F.3d 255, 261 (2d Cir. 2003); Pac. Reins. Mgmt. Corp. v. Ohio Reins. Corp., 935 F.2d 1019, 1024-25 (9th Cir. 1991); Harper Ins. Ltd. v. Century Indem. Co., 819 F. Supp. 2d 270, 278 (S.D.N.Y.

2011).  This is a huge advantage: the prospects for successful arbitration are measurably enhanced if the arbitrators have flexibility to custom-tailor remedies to fit particular circumstances.  See Yasuda Fire & Marine Ins. Co. of Eur. v. Cont'l Cas. Co., 37 F.3d 345, 351 (7th Cir. 1994).  An honorable engagement provision ensures that flexibility.

We therefore hold that the honorable engagement provisions in the arbitration clauses of the underlying agreements authorized the arbitrators to grant equitable remedies.  We further hold that the reservation of rights procedure is such a remedy.  Consequently, National's objection to that procedure is unavailing.

We add a coda.  National makes much of an event that occurred after the arbitrators promulgated the contract interpretation award: a decision by the arbitrators in the second phase of this arbitration that struck a reservation of rights letter submitted by National in connection with certain payments.  This decision shows, as National sees it, that the reservation of rights procedure effectively forecloses both its inspection and audit rights and its ability to recoup improper payments from First State.

In the Shakespearean phrase, National's fears are less than horrible imaginings. William Shakespeare, Macbeth, act 1, sc. 3 (circa 1606).  First State acknowledged both in its brief and at oral argument in this court that the contract interpretation award

-11-

does not condition National's inspection, audit, or recoupment rights on its submission of an appropriate reservation of rights. As First State concedes, the contract interpretation award leaves National, upon receipt of a billing from First State, with three options: it may (i) reject the billing, (ii) pay the billing without comment, or (iii) pay the billing with a reservation of rights. Whether National employs the second or third option when paying a particular billing, it retains the right thereafter to inspect First State's records, audit the claim, and seek recoupment through a subsequent arbitration should it conclude that payment was improperly made. First State has endorsed this reading of the contract interpretation award and, therefore, it cannot assert either the absence or inadequacy of a reservation of rights as a defense to future recoupment efforts by National.

## III. CONCLUSION

We need go no further. For the reasons elucidated above, the denial of National's cross-petition to vacate and the order confirming the contract interpretation award are


**Affirmed**.